[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DEC 22, 2008
THOMAS K. KAHN
CLERK

————————————————

No. 07-14090

————————————————

D. C. Docket Nos. 03-00575-CV-BE-2
02-00655-CV-KOB

JUAN AQUAS ROMERO, JANE DOES, I through VI,
JOHN DOES, I & II, JIMMY RUBIO SUAREZ,
FRANCISCO RUIZ DAZA, SINTRAMIENERGETICA,

Plaintiffs-Appellants-Cross Appellees,

versus

DRUMMOND COMPANY, INC., DRUMMOND, LTD,
AUGUSTO JIMENEZ,

Defendants-Appellees-Cross Appellants,

GARRY N. DRUMMOND,

Defendant.

————————————————

Appeals from the United States District Court
for the Northern District of Alabama

————————————————

**(December 22, 2008)**

Before EDMONDSON, Chief Judge, BLACK and PRYOR, Circuit Judges.

PRYOR, Circuit Judge:

These appeals present a host of issues arising out of litigation about whether executives of Drummond, Ltd., the Colombian subsidiary of a coal mining company in Alabama, paid paramilitary operatives to torture and assassinate leaders of a Colombian trade union, SINTRAMIENERGETICA. In 2002 and 2003, the union and several of its leaders and relatives of deceased leaders sued Drummond and its parent company and executives under the Alien Tort Statute, 28 U.S.C. § 1350, and the Torture Victim Protection Act of 1991, 106 Stat. 73, codified at 28 U.S.C. § 1350, note. The Alien Tort Statute grants to federal courts original jurisdiction over "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. The Torture Act establishes a separate cause of action for victims of torture and extrajudicial killing. 28 U.S.C. § 1350, note § 2(a). The district court consolidated the complaints and later granted partial summary judgment against them; one claim for relief that Drummond aided and abetted the killings, which were war crimes, remained. At a trial of that claim, the jury returned a verdict for Drummond. The plaintiffs appeal the partial summary judgment and a series of discovery and evidentiary rulings made before and during the trial. Long after the

2

discovery deadline had been extended and later expired, the plaintiffs moved for continuances and the admission of the testimonies of several new witnesses, and some of those requests were denied. Drummond challenges the subject-matter jurisdiction of the district court. We conclude that the district court had subject-matter jurisdiction, did not commit any reversible error in its other rulings, and did not abuse its discretion in denying the plaintiffs' requests about their late-disclosed witnesses. We affirm.

## I. BACKGROUND

The union, its leaders, and relatives of its leaders complained that Augusto Jimenez, the president of the mining operations of Drummond, Ltd., with the knowledge of company executives in the United States, hired paramilitaries affiliated with the United Self-Defense Forces of Colombia to torture union leaders Juan Aquas Romero, Jimmy Rubio Suarez, and Francisco Ruiz Daza, and to kill union leaders Valmore Locarno Rodriquez, Victor Hugo Orcasita Amaya, and Gustavo Soler Mora. The complaint included claims of torture, extrajudicial killing, and denials of the right to associate under the Alien Tort Statute, claims of torture and extrajudicial killing under the Torture Act, a claim of wrongful death under Colombian law, and claims for assault, intentional infliction of emotional

distress, negligent infliction of emotional distress, negligent supervision, and false imprisonment under Alabama law.

Our discussion of the background of this litigation is divided in five parts. We first discuss a pretrial ruling that dismissed parts of the complaint. We then turn to the discovery that occurred under the scheduling order. We next address issues about late discovery and disclosures. We then discuss the motion of Drummond for summary judgment and the ruling of the district court. Finally, we address the trial.

*A. Partial Dismissal*

In 2002, Drummond moved to dismiss the complaint. Drummond argued that the union lacked standing to sue for wrongful death and that corporations are not subject to suit under the Torture Act. <u>See</u> <u>Estate of Valmore Lacarno Rodriguez v. Drummond Co.</u>, 256 F. Supp. 2d 1250 (N.D. Ala. 2003). The district court granted in part and denied in part that motion. The district court ruled that the union lacked standing to pursue a wrongful death claim under Alabama law, <u>id.</u> at 1257, Colombian law, <u>id.</u> at 1258, and the Torture Act, <u>id.</u> at 1268, and that corporations are subject to suit under that Act, <u>id.</u> at 1266–67.

*B. Discovery*

4

Discovery commenced in July 2003. In May 2004, the district court entered a scheduling order. The court set deadlines for disclosures of information about expert witnesses of March 15, 2005, for the plaintiffs and April 15, 2005, for Drummond; a discovery deadline of August 31, 2005; and a tentative trial date of November 7, 2005.

As they scheduled depositions in Birmingham, Alabama, and in foreign countries by videoconference, the parties sought assistance from the district court in scheduling the deposition of one of the plaintiffs, Rubio, a Colombian citizen who worked for Drummond and held various leadership roles in the union. Rubio had provided the union a sworn declaration in which he stated that he was present at various meetings between paramilitary leaders and Drummond executives when the paramilitaries and executives discussed the assassination of the union leaders. In May 2004, Drummond requested that Rubio appear in Birmingham, Alabama, and in October 2004, the plaintiffs moved for a protective order to allow him to appear in Venezuela or by videoconference. The plaintiffs represented to the district court that Rubio had received threats against his life and fled to Venezuela after he provided information regarding paramilitary activities to the Colombian government. The plaintiffs also represented that Rubio was "unable to obtain a visa to enter the United States, despite his attempts to do so." On January 28,

5

2005, the district court entered a protective order that required Drummond to take Rubio's deposition either by videoconference or in a location outside the United States upon which the parties could agree. The parties scheduled the deposition for late March 2005 in Venezuela.

On March 15, 2005, on the joint motion of the parties, the district court revised the scheduling order. The district court extended the deadline for disclosures about expert witnesses to July 18, 2005, for the plaintiffs and August 19, 2005, for Drummond; the discovery deadline to December 1, 2005; and the trial date to May 2006. On the deadline for disclosures, July 18, 2005, the plaintiffs submitted reports from three expert witnesses: Dr. Sonja Binkhorst, Professor Luz Nagle, and Mr. Tito Gaitan.

Shortly before the deposition of Rubio was to occur, Drummond learned of an outstanding Colombian warrant for Rubio's arrest. Drummond cancelled the deposition and moved to dismiss Rubio's complaint or, in the alternative, to amend the protective order to require Rubio to appear in Birmingham. Because the warrant had been issued before Rubio requested the protective order, Drummond argued that Rubio had not been truthful with the district court. The plaintiffs asserted an interest in deposing Rubio to preserve his testimony for the trial. When it considered the motion of Drummond to dismiss Rubio's complaint,

6

the district court learned that Rubio had received correspondence from the United States Embassy in Colombia that stated that he would be unable to obtain a visa to travel to the United States because of an outstanding arrest warrant in Colombia. Because Rubio had not been convicted of the charges against him, the district court declined to dismiss Rubio's complaint or to amend the protective order.

The plaintiffs rescheduled Rubio's deposition to occur on October 12 and 13, 2005, again in Venezuela. On September 29, 2005, Drummond moved to stay the deposition until it could obtain documents from the State Department regarding Rubio's efforts to secure a visa to enter the United States. On September 30, 2005, the district court granted the motion. On December 1, 2005, the discovery deadline passed.

### C. Post-Deadline Discovery and Late-Disclosed Witnesses

In the months after discovery closed, the district court continued to adjudicate discovery disputes and receive requests from the plaintiffs to depose and offer testimony from new witnesses. On April 19, 2006, on the motion of Drummond, the district court ruled that the disclosure reports of the plaintiffs' experts failed to comply with Federal Rule of Civil Procedure 26(a)(2)(B), and the district court barred the plaintiffs from offering any expert testimony at trial. On April 26, 2006, the district court continued the trial to October 2, 2006.

On the same day that it continued the trial, the district court, on the motion of the plaintiffs, ordered the deposition of Rubio to proceed in early July 2006. On June 13, 2006, the State Department informed the district court that it had no record of any visa application from Rubio. The district court again postponed Rubio's deposition to await further information from the State Department. On August 2, 2006, the State Department informed the district court that it was not aware of any foreign policy concern that would be raised if Rubio was deposed in a third country. The district court continued the trial for the third time, to May 14, 2007.

In the meantime, on May 16, 2006, the plaintiffs submitted a sworn declaration from a late-disclosed witness, Rafael Garcia, a former director of a Colombian law enforcement agency who is imprisoned in Colombia for erasing immigration records for drug traffickers. Garcia declared that in 2001 he attended a meeting between Jimenez and a representative of the United Self-Defense Forces where Jimenez gave the representative "a suitcase full of money" and Jimenez said that the money was to be used to pay a man to assassinate "specific union leaders at Drummond." Because Garcia was in prison, a letter rogatory was necessary to make his declaration admissible at trial. The plaintiffs requested the letter on June 28, 2006. On August 10, 2006, the district court denied the request because it

8

found that the "testimony would be cumulative; the motion is untimely, and allowing this deposition at this late juncture would unduly prejudice the Defendants and delay the trial and conclusion of these cases."

At a status conference the next day, the parties revisited the scheduling of Rubio's deposition. The district court expressed frustration that "at every step of the matter involving Mr. Rubio's efforts to obtain a visa, the plaintiffs have either misled the court or have not been candid in what they have said to the court." The district court ordered the plaintiffs' counsel to attempt to secure a visa for Rubio to testify in the United States, and it ordered the parties to arrange to take the deposition in a foreign country if necessary. The parties scheduled the deposition for late September in Ecuador. At a status conference on September 15, 2006, Drummond expressed concern that the plaintiffs would be unable to secure Rubio's attendance because Rubio had gone into hiding after his father-in-law was killed. The plaintiffs represented to the court that they had confirmed with Rubio, through his family, that he would attend the deposition. The plaintiffs later cancelled the deposition, and it was not rescheduled.

On September 21, 2006, the plaintiffs asked the district court to issue a letter rogatory to depose a second late-disclosed witness, Jorge Cuarenta, also known as "Jorge 40." Jorge 40 was the leader of the Northern Bloc of the United

Self-Defense Forces. Garcia stated in his declaration that Jorge 40 was meant to receive the "suitcase full of money" as payment for "murder[ing] the union leaders." The Colombian government had arrested Jorge 40 and accused him of the murder of the union leaders. The district court denied the plaintiffs' motion on December 12, 2006, because the discovery deadline had passed nine months before the plaintiffs disclosed Jorge 40, the plaintiffs had failed even to identify Jorge 40 before that deadline, and allowing testimony from Jorge 40 would prejudice Drummond and delay the trial.

### D. Partial Summary Judgment

In November 2006, Drummond moved for summary judgment. In their opposition, the plaintiffs asserted that, despite the ruling of the district court that they could not depose Garcia, they intended to call him as a witness at trial by videoconference. On February 27, 2007, the district court held a hearing on the motion for summary judgment, and the district court did not consider the declarations of Rubio or Garcia. By the time of this hearing, Rubio had not had direct contact with his counsel for at least six months, and the plaintiffs offered no evidence that they could produce him to preserve his testimony and for cross-examination.

On March 5, 2007, the court granted summary judgment in part and denied it in part. The district court granted summary judgment on the claims about which Garcia would have testified, the agency and conspiracy claims, and the district court requested that the parties brief whether Garcia should be allowed to testify at trial as a late-disclosed witness. The district court committed to allow the plaintiffs to petition the court to reconsider summary judgment on the agency and conspiracy claims if the district court later determined that Garcia could testify. The district court dismissed all of Rubio's claims, all claims against the Drummond parent corporation, all torture claims, the claim for extrajudicial killing under the Torture Act, and all state law claims. The plaintiffs dismissed their right-to-associate claims under the Alien Tort Statute. The district court concluded that sufficient evidence supported the claim for aiding and abetting extrajudicial killings in violation of the Alien Tort Statute.

On March 20, 2007, the district court ruled that Garcia could testify at trial by videoconference or deposition if Drummond had an opportunity to depose him and conduct other discovery to rebut or impeach his testimony. This ruling required another delay of the trial, and on April 3, 2007, with the agreement of the parties, the district court continued the trial to July 9, 2007. The plaintiffs proceeded with their efforts to preserve Garcia's testimony, and on April 16, 2007,

the letter rogatory was transmitted to the State Department.  On April 30, 2007, the district court denied the plaintiffs' motion to amend their complaint to plead their state law claims under Colombian law.  On May 24, 2007, the plaintiffs moved for an additional continuance to allow time to receive a response from the Colombian government to the letter rogatory regarding Garcia, and the district court denied their motion.

On June 12, 2007, less than a month before the trial, the plaintiffs moved to admit the testimony of a third late-disclosed witness, Alberto Visbal, a former paramilitary who allegedly was present at two meetings between Jimenez and Jorge 40 regarding the assassination of the union leaders.  The plaintiffs alleged that they first learned of Visbal in June 2007 and that they first met with Visbal in Panama on June 8, 2007.  The plaintiffs also alleged that Visbal became available as a witness because of dramatic political shifts in Colombia in which the Colombian government began to investigate paramilitary murders of union leaders.  The plaintiffs submitted with their motion a declaration from Visbal in which he stated that he was present when Jimenez met with Jorge 40 and that Garcia was present at one of the meetings.

On June 15, 2007, the district court denied the plaintiffs' motion to admit testimony from Visbal, and it gave four reasons for its decision.  First, it had

declared on May 31, 2007, that "there would be no more new witnesses, even if they rose from the grave." Second, the district court doubted that Visbal could offer probative testimony because his declaration was largely hearsay. Third, the district court found that the plaintiffs had not been diligent in attempting to discover witnesses such as Visbal during the discovery period because they had not "approached any Colombian law enforcement officials during the pendency of discovery, or prior to that, to see if they had information . . . ." Fourth, the district court expressed concern that an order granting the motion "to admit" Visbal's testimony would be reported in the news media and would create among potential members of the jury the inaccurate impression that the plaintiffs had already taken Visbal's sworn testimony for trial.

On the same day, the district court also ruled that it would not exercise jurisdiction over the plaintiffs' claim for wrongful death under Colombian law. The district court concluded that the claim raised a complex issue of law because the parties had provided conflicting translations of Spanish-language legal precedents. The district court was "unable to discern" Colombian law.

On July 2, 2007, a week before the trial, the plaintiffs renewed their motion to continue the trial to allow time to receive a response to the letter rogatory regarding Garcia, and the district court again denied their motion. The plaintiffs

13

filed a writ of mandamus, and we denied the writ. Pretrial rulings disposed of all claims except the claim of extrajudicial killings under the Alien Tort Statute, that Drummond aided and abetted the killings, which were war crimes.

*E. Trial and More Late-Disclosed Witnesses*

The trial began on July 9, 2007, and on July 24, after the plaintiffs and Drummond had rested, the plaintiffs moved to admit testimony from two unexpected witnesses. First, the plaintiffs moved to admit the testimony of a fourth late-disclosed witness, Alcon, who, like Visbal, is a former paramilitary. The plaintiffs alleged that they first learned about Alcon near the end of the trial, that Alcon demobilized as part of the Justice and Peace process, a Colombian initiative to demobilize paramilitaries, and that Alcon would testify that he, like Visbal, observed meetings between Jimenez and Jorge 40. Second, the plaintiffs moved to admit testimony from Rubio, whom they alleged had been located in Venezuela and was willing to travel to Panama to testify. The district court denied both motions. The jury returned a verdict for Drummond.

## II. STANDARDS OF REVIEW

Our review of two matters is plenary. We review <u>de novo</u> questions of subject-matter jurisdiction. <u>United States v. Perez</u>, 956 F.2d 1098, 1101 (11th Cir.

14

1992).  We also review de novo a summary judgment.  Whatley v. CNA Ins. Cos., 189 F.3d 1310, 1313 (11th Cir. 1999).

We review the remaining issues, which comprise the great majority, deferentially.  We review for abuse of discretion a decision not to exercise supplemental jurisdiction, Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1185 (11th Cir. 2003), a decision to enforce a pretrial order and deny amendments to pleadings, see Sosa v. Airprint Sys., Inc., 133 F.3d 1417, 1418 (11th Cir. 1998) (per curiam), a decision to exclude late-disclosed witness testimony, Fabrica Italiana Lavorazione Materie Organiche S.A.S. v. Kaiser Aluminum & Chem. Corp., 684 F.2d 776, 780 (11th Cir. 1982), a decision regarding a continuance, United States v. 0.161 Acres of Land in Birmingham, Ala., 837 F.2d 1036, 1039 (11th Cir. 1988), and a decision to exclude expert testimony because experts' disclosures fail to comply with Federal Rule of Civil Procedure 26(a)(2)(B), Prieto v. Malgor, 361 F.3d 1313, 1317 (11th Cir. 2004).

### III.  DISCUSSION

These appeals present multiple issues.  Drummond presents the first three as issues of subject-matter jurisdiction.  Drummond first argues that neither the Torture Act nor the Alien Tort Statute allows suits against corporations. Drummond next argues that these Acts do not provide claims for aiding and

15

abetting. Finally, Drummond argues that the Torture Act provides the exclusive cause of action for extrajudicial killing in violation of international law.

The next four issues relate to the partial summary judgment. The plaintiffs argue that the district court abused its discretion by excluding the declarations of Garcia and Rubio and erred by granting summary judgment against the conspiracy and agency claims; the district court applied the wrong legal standard to evaluate whether the plaintiffs had established state action under the Torture Act and erroneously granted summary judgment against the claims under that Act; the district court abused its discretion by declining to exercise supplemental jurisdiction over the plaintiffs' wrongful death claims under Colombian law; the district court erred by dismissing the plaintiffs' claims under Alabama law; and the district court abused its discretion in denying the plaintiffs leave to amend their complaint to allege claims under Colombian law.

The final issues pertain to evidentiary and discovery rulings of the district court. The plaintiffs argue that the district court abused its discretion in the series of rulings it entered after the discovery deadline that excluded testimony from the late-disclosed witnesses Visbal and Alcon, disallowed a letter rogatory for the late-disclosed witness Jorge 40, denied further continuances so that the plaintiffs could potentially receive a response to the letter rogatory regarding the late-

disclosed witness Garcia, and denied a continuance on the last day of the trial so that the plaintiffs could potentially take the testimony of Rubio in Panama. The plaintiffs also contend that the district court abused its discretion when it excluded the testimonies of the plaintiffs' experts.

Our discussion is divided in seven parts. Because matters of jurisdiction affect our authority to reach the merits of the appeal, we discuss first the subject-matter jurisdiction of the district court. We then discuss the plaintiffs' arguments in the remaining six parts: we address, first, the plaintiffs' arguments about the Torture Act; second, whether the district court abused its discretion by dismissing the claims of wrongful death under Colombian law; third, whether the district court abused its discretion in dismissing the tort claims under Alabama law and denying leave to amend those claims under Colombian law; fourth, whether the district court abused its discretion in its rulings about late-disclosed witnesses; fifth, whether the district court abused its discretion in excluding the testimonies of the plaintiffs' experts; and sixth, whether the district court erred when it entered summary judgment and refused to consider the declarations of Rubio and Garcia.

*A. The District Court Had Subject-Matter Jurisdiction.*

Drummond raises three objections about jurisdiction. First, Drummond argues that the Torture Act and the Alien Tort Statute do not permit suits against

17

corporations. Second, Drummond argues that those Acts do not provide liability for aiding and abetting. Third, Drummond contends that the district court should have dismissed the plaintiffs' claim for extrajudicial killing under the Alien Tort Statute because the Torture Act provides the exclusive cause of action for that claim. We conclude that the issues under the Torture Act are not issues of jurisdiction and the arguments of Drummond about the Alien Tort Statute are foreclosed by our precedent.

The two related statutes that pertain to this appeal perform complementary but distinct roles. The Alien Tort Statute is jurisdictional and does not create an independent cause of action. See Sosa v. Alvarez-Machain, 542 U.S. 692, 724, 124 S. Ct. 2739, 2761 (2004). In contrast, the Torture Act provides a cause of action for torture and extrajudicial killing but does not grant jurisdiction. 28 U.S.C. § 1350, note, § 2(a). Federal courts are empowered to entertain complaints under the Torture Act when either the Alien Tort Statute or the federal question statute, 28 U.S.C. § 1331, provides jurisdiction.

This distinction between the Alien Tort Statute and the Torture Act gives rise to a general rule regarding claims under the latter Act: when either the Alien Tort Statute or federal question statute provides jurisdiction, defects in pleading claims under the Torture Act are not jurisdictional defects. These pleading issues

18

involve stating claims on which relief can be granted and should be raised in motions filed under Federal Rule of Civil Procedure 12(b)(6). The Alien Tort Statute provides jurisdiction over the plaintiffs' claims for violations of the law of nations; the federal question statute provides jurisdiction over their claims under the Torture Act; and the supplemental jurisdiction statute provides jurisdiction over their claims under state law and Colombian law. See 28 U.S.C. § 1367.

Even if we agreed with Drummond that its argument about corporate liability under the Torture Act was jurisdictional, we would be bound to reject that argument. Under the law of this Circuit, the Torture Act allows suits against corporate defendants. We held that a complaint, under the Act, stated a claim against a corporate defendant in Aldana v. Del Monte Fresh Produce, Inc., 416 F.3d 1242 (11th Cir. 2005), and we are bound by that precedent.

Because the Alien Tort Statute is jurisdictional, we must address the argument of Drummond about corporate liability under that statute. The text of the Alien Tort Statute provides no express exception for corporations, see 28 U.S.C. § 1350, and the law of this Circuit is that this statute grants jurisdiction from complaints of torture against corporate defendants. Aldana, 416 F.3d at 1242. Again, we are bound by that precedent.

19

As Drummond acknowledges, the law of this Circuit permits a plaintiff to plead a theory of aiding and abetting liability under the Alien Tort Statute and the Torture Act. Cabello v. Fernandez-Larios, 402 F.3d 1148, 1157–58 (11th Cir. 2005); see also Aldana, 416 F.3d at 1247–48. We based our decision in Cabello on the text of the statutes, the decisions of two sister circuits, Hilao v. Estate of Marcos, 103 F.3d 767, 776–77 (9th Cir. 1996), and Carmichael v. United Technologies Corp., 835 F.2d 109, 113–14 (5th Cir. 1988), and the legislative history of the Torture Act. See Cabello, 402 F.3d at 1157–58. We are bound by our decision in Cabello.

As Drummond also acknowledges, the law of this Circuit suggests that the Torture Act is not the exclusive cause of action for claims of extrajudicial killing. In Aldana, we held that "a plaintiff may bring distinct claims for torture under each statute," 416 F.3d at 1250, and the analysis that supported that conclusion supports the same conclusion for claims of extrajudicial killing. In Aldana, we stated that the statutory texts permit plaintiffs to seek relief for claims of torture under both statutes because both define torture and "each statute provides a means to recover for torture as that term separately draws its meaning from each statute." Id. The same is true for extrajudicial killing, which is actionable under the Alien Tort Statute if it is "committed in violation of the law of nations," 28 U.S.C. §

1350, and under the Torture Act as that Act expressly defines it, 28 U.S.C. § 1350, note § 3(a). For the same reason that we held in <u>Aldana</u> that the Torture Act does not provide the exclusive remedy for claims of torture, we decline to read the Torture Act as providing the exclusive remedy for claims of extrajudicial killing.

*B. The District Court Applied the Correct Legal Standard to the Claims under the Torture Act and Correctly Concluded that the Plaintiffs Failed To Present Sufficient Evidence of State Action.*

The plaintiffs argue that the district court applied the incorrect legal standard to assess whether they had presented sufficient evidence of state action. There is an express requirement of state action in the Torture Act, which pertains to individuals "who, under actual or apparent authority, or color of law, of any foreign nation" engage in torture or extrajudicial killing. 28 U.S.C. § 1350, note § 2(a). Under the Alien Tort Statute, state actors are the main objects of the law of nations, but individuals may be liable, under the law of nations, for some conduct, such as war crimes, regardless of whether they acted under color of law of a foreign nation. <u>See, e.g.</u>, <u>Kadic v. Karadzic</u>, 70 F.3d 232, 239–41 (2d Cir. 1995). The district court concluded that the plaintiffs presented sufficient evidence of war crimes to support a claim under the Alien Tort Statute, but the district court concluded that the plaintiffs failed to present sufficient evidence of state action to support their claims under the Torture Act.

21

The plaintiffs contend that the district court "applied an erroneous test of participation by state actors" to their claims under the Torture Act because the district court required them to prove that the paramilitaries and Drummond shared an objective with the Colombian government of "eradication of the union." As an initial matter, the plaintiffs' argument misrepresents the decision of the district court. When the district court inquired whether the paramilitaries and Drummond shared an objective with the Colombian government, it was evaluating whether the plaintiffs' claims satisfied the state action requirement of the Alien Tort Statute, not the Torture Act. We cannot reverse the summary judgment against the plaintiffs' claims under the Torture Act on the basis of a decision about the Alien Tort Statute.

The parties disagree about how to apply the precedents regarding state action under the Torture Act. The plaintiffs cite Aldana, 416 F.3d at 1249–50, and Smith v. Brookshire Brothers, Inc., 519 F.2d 93, 94–95 (5th Cir. 1975), for the proposition that "[a] single state actor cloaked with 'color of law' can establish state action." In Aldana, we held that a complaint that a mob of vigilantes took hostages at gunpoint sufficiently alleged state action because the complaint alleged that the mayor of the town actively participated in wrongdoing. 416 F.3d at 1249–50. Both parties cite Brentwood Academy v. Tennessee Secondary

School Athletic Association, 531 U.S. 288, 295, 121 S. Ct. 924, 930 (2001), but for different propositions. The plaintiffs cite Brentwood Academy for the proposition that a private party constitutes a state actor when the two are "entwined," id. at 296, 121 S. Ct. at 930, and Drummond cites that decision for the proposition that a private party constitutes a state actor when there is "such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the state itself," id. at 295, 121 S. Ct. at 930 (internal quotation marks omitted). Drummond also cites Rayburn ex rel. Rayburn v. Hogue, 241 F.3d 1341 (11th Cir. 2001), for the proposition that there must be a symbiotic relationship between a private actor and the government that involves the conduct that is the subject of the complaint.

We read these decisions to mean two things. First, there must be proof of a symbiotic relationship between a private actor and the government that involves the torture or killing alleged in the complaint to satisfy the requirement of state action under the Torture Act. Second, a plaintiff may prove that relationship, as we held in Aldana, by presenting evidence of the active participation of a single official.

When the district court evaluated the plaintiffs' evidence of a symbiotic relationship, it applied this understanding of the law. The district court evaluated

23

the plaintiffs' claims under the Torture Act by inquiring whether the plaintiffs had presented evidence "that the symbiotic relationship between the paramilitaries and the Colombian military had anything to do with the conduct at issue here, which is the killing of the union officers." The district court did not err.

The plaintiffs rely on five sources of evidence to satisfy their burden of proving state action, but none of that evidence proves a symbiotic relationship related to their complaint. First, the plaintiffs contend that a report written by the Colombian prosecutor's office "concluded that some of the individuals who murdered Locarno and Orcasita were wearing military uniforms at the time," but this report was inadmissible hearsay that cannot be reduced to a form admissible at trial. The district court was correct not to consider it. Rowell v. BellSouth Corp., 433 F.3d 794, 800 (11th Cir. 2005); see also Macuba v. DeBoer, 193 F.3d 1316, 1322 (11th Cir. 1999). Second, the plaintiffs contend that reports published by the State Department and the United Nations establish that Colombian paramilitaries have a close and regular relationship with the military of the Colombian government, but proof of a general relationship is not enough. The relationship must involve the subject of the complaint. Although the murders of the union leaders are mentioned in one of the reports, the reports do not even suggest that the Colombian military was involved in those crimes. Third, the plaintiffs rely on

24

the internal security reports of Drummond, which state that paramilitaries are sometimes supported by the Colombian military, but these reports are not evidence of state action regarding the murders described in the complaint. Fourth, the plaintiffs argue that if either Garcia's or Rubio's declaration is admitted, it provides "direct evidence of official participation in [paramilitary] operations." Rubio's declaration was inadmissible hearsay that the district court did not expect to be admissible at trial because Rubio would not testify at trial. The district court was correct not to consider the declaration. Rowell, 433 F.3d at 800. Although the plaintiffs represent that Garcia's declaration states that "Garcia himself aided the [United Self-Defense Forces] as a government official," Garcia's declaration says otherwise. Garcia's declaration states that he became a government official the year after he attended a meeting between Jimenez and a representative of the United Self-Defense Forces. This statement does not even allege, much less prove, state action. Fifth, the plaintiffs argue that the testimony of Edwin Guzman, a former Sergeant in the Colombian Army, provides evidence of state action, but because the plaintiffs discovered and presented this evidence after the district court entered summary judgment, we cannot consider it. Chapman v. AI Transp., 229 F.3d 1012, 1026–27 (11th Cir. 2000). Because the plaintiffs failed to offer evidence either that state actors were actively involved in the assassination of

the union leaders or that the paramilitary assassins enjoyed a symbiotic relationship with the military for the purpose of those assassinations, the district court correctly granted summary judgment against the claims under the Torture Act.

## C. *The District Court Did Not Abuse Its Discretion When It Declined To Consider Plaintiffs' Claim of Wrongful Death Under Colombian Law.*

The plaintiffs contend that the district court abused its discretion when it declined to exercise supplemental jurisdiction over their claim of wrongful death under Colombian law, but we disagree. The supplemental jurisdiction statute permits district courts to decline supplemental jurisdiction when "the claim raises a novel or complex issue of State law." 28 U.S.C. § 1367(c)(1). The district court concluded that the Colombian law claim met that requirement. After extensive briefing of this issue, the district court was unable to reconcile conflicting translations of Colombian legal precedents, to "navigate the complexities of the parties' submissions," or "to discern . . . the Colombian law requisites for a wrongful death claim." The conclusion of the district court that the claim raised complex issues is supported by the record, and the court was well within its discretion to decline jurisdiction over that claim.

## D. *The District Court Did Not Err in Dismissing the Plaintiffs' Claims of Tort Under Alabama Law Nor Abuse Its Discretion in Denying Leave To Amend the Complaint To Plead Those Claims Under Colombian Law.*

The plaintiffs argue that the district court erred when it dismissed their tort claims under state law, but we disagree. The district court dismissed the plaintiffs' claims, under Alabama law, for assault, intentional infliction of emotional distress, negligent supervision, false imprisonment, and negligent infliction of emotional distress because Alabama law does not apply to injuries that occurred outside the state. Because Alabama has long followed the rule of lex loci delicti, Drummond was entitled to summary judgment on those claims. See Middleton v. Caterpillar Indus., Inc., 979 So. 2d 53 (Ala. 2007); Ala. Great S. R.R. Co. v. Carroll, 11 So. 803 (Ala. 1892).

The plaintiffs also argue that the district court abused its discretion when it denied their motion to amend their complaint to plead their tort claims under Colombian law, but again we disagree. The district court denied the plaintiffs' motion on April 30, 2007, and stated at a hearing on that date, "It is way, way, way past the deadline for amending the complaint. We're literally on the eve of trial, and we're not going to start messing with the pleadings at this late date." This decision, under Federal Rule of Civil Procedure 16, was well within the discretion of the court. See Sosa, 133 F.3d at 1418. "[B]ecause [the plaintiffs'] motion to amend was filed after the scheduling order's deadline, [the plaintiffs had to]

27

demonstrate good cause under Rule 16(b) before [a court] will consider whether amendment is proper under Rule 15(a)." Id. at 1419.

The plaintiffs failed to establish good cause for amending their pleadings after the deadline in the scheduling order. To establish good cause, the party seeking the extension must have been diligent. See id. at 1418; Fed. R. Civ. P. 16 advisory committee's note. The plaintiffs were not diligent in ascertaining the law before filing and twice amending their complaint. "For 115 years, the principle of lex loci delicti has governed [tort] cases . . . in Alabama courts." Middleton, 979 So. 2d at 57. The plaintiffs should have known that they would need to plead tort claims under Colombian law because their injuries occurred in Colombia.

*E. The District Court Did Not Abuse Its Discretion When It Refused To Allow Testimony from New Witnesses After the Discovery Deadline Had Passed.*

The plaintiffs contend that the district court abused its discretion when it refused to admit testimony from several witnesses who could have offered "smoking gun" evidence that Drummond hired the United Self-Defense Forces to assassinate the union leaders, but we disagree. The district court properly applied the correct legal standard for each witness. We discuss each witness in turn.

1.  Garcia: The District Court Did Not Abuse Its Discretion When It Denied the Plaintiffs' Motion for a Continuance To Allow the Possible Completion of the Letters Rogatory Process.

The district court was within its discretion to deny the plaintiffs' request for a continuance from the trial date of July 9 to secure Garcia's testimony. The district court had already granted one continuance, and the plaintiffs had consented to the new trial date. The district court correctly applied Circuit precedent in exercising its discretion.

The district court granted a continuance to allow the plaintiffs to obtain Garcia's testimony. After the district court ruled that Garcia could testify at trial by videoconference or deposition if Drummond had an opportunity to depose him and conduct related discovery, the district court in March 2007 held a status conference regarding the necessary letters rogatory and scheduling matters. During this conference, the court continued the trial from May 14, 2007, to July 9, 2007. The plaintiffs describe this conference as one in which the court "committed . . . reversible error by knowingly providing Plaintiffs with insufficient time to complete the Letters Rogatory process."

The plaintiffs argue that after the district court allowed Garcia's testimony as a late-disclosed witness, it should have allowed a longer continuance to permit

29

them to obtain his testimony, and they rely on our decision in <u>R.M.R. ex rel.</u> <u>P.A.L. v. Muscogee County School District</u>, 165 F.3d 812, 818–19 (11th Cir. 1999). Drummond contends that the plaintiffs consented to the July trial date and that the district court did not err because it committed to recess the trial if it received a response to the letter rogatory during the trial.

The plaintiffs contend that the court erred at the status conference because our decision in <u>Muscogee County</u> suggests that "once it is clear that there is newly-discovered evidence, a trial continuance is the appropriate remedy to permit the movant to introduce newly discovered evidence while minimizing any prejudice to the nonmoving party," but <u>Muscogee County</u> is distinguishable. In <u>Muscogee County</u>, the plaintiff discovered, in the middle of trial, a witness who could offer crucial testimony. 165 F.3d at 818. The plaintiff did not move for a continuance; instead, he asked the court either to admit the witness's testimony immediately or exclude it altogether. <u>See</u> <u>id.</u> We stated that moving for a continuance would have mitigated the prejudice to the defendants, and we held that the district court did not abuse its discretion in barring the testimony when the plaintiff presented the court with a binary option. <u>See</u> <u>id.</u> In contrast, the district court <u>granted</u> a continuance to allow the plaintiffs to secure Garcia's testimony

because it did not "see any way that we could get any of this [letter rogatory process] done by our May 14th date."

The plaintiffs argue that the district court should have granted further continuances after the continuance to July 9 proved to be inadequate to secure Garcia's testimony, but the plaintiffs consented to the trial date on July 9. The participants in the March status conference discussed that the process for letters rogatory ordinarily lasts approximately six months, and that the district court had received no response to a letter it had transmitted more than six months previously. The plaintiffs nevertheless consented to a July 9 trial date. Two months later, the plaintiffs moved to continue the trial after they learned from the State Department that the letter rogatory was transmitted to the Colombian government on May 18 and that "we can expect the process to take six months to a year." The district court denied the motion because the plaintiffs had consented to the trial date with the knowledge that it might take up to six months to depose Garcia. The plaintiffs renewed their motion a week before the trial, and the district court again denied the motion because "there's no guarantee that we can ever get Mr. Garcia's deposition."

The district court did not abuse its discretion. We consider four factors to determine whether a denial of a continuance constitutes an abuse of discretion:

> (1) the moving party's diligence in its efforts to ready its case prior to the date set for hearing; (2) the likelihood that the need for a continuance would have been remedied had the continuance been granted; (3) the extent to which granting the continuance would have inconvenienced the court and the opposing party; (4) the extent to which the moving party might have suffered harm as a result of the district court's denial.

Rink v. Cheminova, Inc., 400 F.3d 1286, 1296 (11th Cir. 2005). The district court considered all four factors, and its findings are supported by the record.

Uncertainty regarding the availability of Garcia's testimony warranted the denial of the continuance. When a moving party cannot establish that a continuance will enable them to procure testimony, we have held that a district court has the discretion to deny the continuance. In United States v. Uptain, we held that a moving party's failure to show "that any of the witnesses he sought to interview and subpoena were available and willing to testify. . . . alone [was] enough to justify denial of [a] continuance." 531 F.2d 1281, 1289 (5th Cir. 1976). In United States v. Bergouignan, we "d[id] not doubt the diligence of counsel's efforts," but we affirmed the denial of a continuance because, at the time the district court considered the motion, counsel "could not demonstrate that his future efforts would be any more successful than those in the past." 764 F.2d 1503, 1508 (11th Cir. 1985). In Rink, we affirmed the denial of continuance even when it would have enabled the moving party to secure the crucial evidence. 400 F.3d at

32

1296. It is well-settled that a district court may deny a continuance when there is no guarantee that granting one will enable a party to secure the crucial testimony.

The plaintiffs also were not diligent in their efforts to discover all of their witnesses before the close of discovery. Although the plaintiffs asserted that dramatic changes in Colombia caused many previously unavailable witnesses to come forward, the plaintiffs failed to explain how those changes affected Garcia. An additional continuance would have prejudiced Drummond and substantially inconvenienced the court; several witnesses were traveling from foreign countries and the parties were coordinating multiple translators.

The plaintiffs allege that they suffered grave harm because they were unable to present Garcia's testimony, but it is not clear that the denial of further continuances is the reason that the plaintiffs were unable to procure Garcia's testimony. Even if the plaintiffs were prejudiced, the district court found, and we agree, that the prejudice was not "undue" because the plaintiffs planned to offer two other witnesses to present similar testimony. The plaintiffs planned to offer testimony from Edwin Guzman and Isnardo Ropero Gonzalez, two late-disclosed witnesses whom the district court had already admitted. Guzman was expected to testify that he had witnessed a meeting between a Drummond security officer and a paramilitary and that Drummond had provided motorcycles to a paramilitary

33

who was responsible for killing the union leaders. Ropero was expected to testify that Drummond paid paramilitaries out of its employment office. Although neither Guzman nor Ropero ultimately testified as expected, the district court anticipated, when it denied the plaintiffs' request for an additional continuance, that the plaintiffs would not suffer undue prejudice because Guzman and Ropero would offer testimony similar to the testimony that Garcia was expected to offer.

### 2. Visbal: The District Court Did Not Abuse Its Discretion When It Refused To Allow Testimony As a Late-Disclosed Witness.

The plaintiffs advance two arguments that the district court abused its discretion when it refused to admit testimony from Visbal, a former paramilitary whom the plaintiffs first disclosed less than a month before the trial. First, the plaintiffs argue that the district court abused its discretion when it applied a blanket rule against witnesses disclosed after May 31, 2007. Second, the plaintiffs argue that, under the five-part test we applied in United States v. Koziy, 728 F.2d 1314 (11th Cir. 1984), the district court abused its discretion when it disallowed Visbal's testimony.

We have explained that, in evaluating whether the exclusion of a late witness was an abuse of discretion, "an appellate court should consider the explanation for the failure to disclose the witness, the importance of the testimony,

and the prejudice to the opposing party [if the witness had been allowed to testify.]" Fabrica Italiana, 684 F.2d at 780 (citing Murphy v. Magnolia Elec. Power Assoc., 639 F.2d 232, 235 (5th Cir. 1981)). We have applied that three-part test in later cases, see, e.g., Muscogee County, 165 F.3d at 818; Bearint ex rel. Bearint v. Dorell Juvenile Group, Inc., 389 F.3d 1339, 1353 (11th Cir. 2004), and it is consistent with our analysis in Koziy. We also have held that the first and third factors, together, can outweigh the second. Bearint, 389 F.3d at 1353 ("Regardless of the importance of [the] testimony, the reasons for the delay in the . . . disclosure and the consequent prejudice that [the] testimony would have caused [the nonmoving party] require us to affirm the district court's ruling.").

The district court did not abuse its discretion when it excluded Visbal's testimony. The district court found that the plaintiffs lacked a good explanation for the delay in disclosing Visbal, part of the explanation was their own lack of diligence, and the plaintiffs had overstated the importance of Visbal's testimony because much of it would be excluded as hearsay. These findings are supported by the record. The plaintiffs initially represented to the court that there had been "no investigation" by the Colombian government of the murders, but then, after learning from Drummond that an investigation was ongoing, the plaintiffs admitted that they had not made any formal request of the government for

35

information about the murders.  Much of Visbal's testimony also would have been inadmissible hearsay.  Our conclusion that the district court was within its discretion obviates the need to consider the plaintiffs' argument that the district court abused its discretion when it applied a blanket rule against witnesses disclosed after May 31, 2007.

3.  Alcon: The District Court Did Not Abuse Its Discretion When It Refused To Allow Testimony From a Witness Disclosed on the Last Day of Trial.

The decision of the district court to exclude the testimony of the former paramilitary Alcon, whom the plaintiffs first disclosed on the last day of the trial, also survives our review under Murphy.  The district court found that there would be "exceptional prejudice to the defendant of trying to get testimony of a witness about whom they have had no opportunity to do any discovery at all," and the court expressed concerns about Alcon's credibility.  The doubts of the court about the significance of Alcon's anticipated testimony were reasonable.

The plaintiffs had not met Alcon when they offered him as a witness because he had been turned away at the Panama border, and they were unable to offer a declaration specifying what he would say.  Allowing such a late-disclosed witness in hopes that he would offer probative testimony, with essentially no opportunity to conduct discovery, would have caused substantial prejudice to

36

Drummond and inconvenience to the district court. The district court was under no obligation to recess the trial.

4. Jorge 40: The District Court Did Not Abuse Its Discretion When It Refused To Issue a Letter Rogatory To Depose Him as a Late-Disclosed Witness.

The decision of the district court not to issue a letter rogatory to obtain the testimony of the former paramilitary leader Jorge 40, whom the plaintiffs disclosed nine months after the discovery deadline, also survives our review under Murphy. The plaintiffs could not provide a reasonable explanation for their failure to disclose Jorge 40 in advance of the discovery deadline, even if it was unlikely that they would have been able to secure his testimony. Although the plaintiffs argue that Jorge 40 "would have much to say about Drummond," when they moved to admit him as a witness they could not explain the importance of his testimony because they had not previously interviewed him and could not specify what he would say. It was dubious, to say the least, that Jorge 40 would admit under oath to his own criminal behavior. Allowing a new witness shortly before trial also would have caused substantial prejudice to Drummond.

5. Rubio: The District Court Did Not Abuse Its Discretion When It Excluded His Testimony on the Last Day of Trial.

The district court also did not abuse its discretion when it ruled on the last day of trial that Rubio, a former plaintiff, could not testify from Panama as a

witness. Rubio's history of failing to appear, together with his counsel's lack of candor regarding his inability to travel, gave the court good reason to be concerned that he would not testify even if it continued the case. The plaintiffs offered no evidence that Rubio was actually available, and an outstanding warrant for his arrest in Colombia made it unlikely that he could travel to Panama. Continuing the trial on the last day of testimony in the hopes that Rubio would appear for the first time also would have caused unfair prejudice to Drummond.

F. *The District Court Did Not Abuse Its Discretion When It Excluded the Plaintiffs' Experts.*

The plaintiffs argue that the district court abused its discretion when it excluded the testimonies of three expert witnesses because the disclosure reports for the witnesses did not comply with the requirements of Federal Rule of Civil Procedure 26(a)(2)(B). This argument fails. The plaintiffs admit that one of the reports, written by Dr. Sonja Binkhorst, was incomplete, so we limit our review to the decision of the district court to exclude the other two reports, written by Professor Luz Nagle and Mr. Tito Gaitan.

Rule 26(a)(2)(B) requires full disclosure about expert witnesses and provides six categories of information that must be disclosed:

(i) a complete statement of all opinions the witness will express and the basis and reasons for them;

38

(ii) the data or other information considered by the witness in forming them;

(iii) any exhibits that will be used to summarize or support them;

(iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;

(v) a list of all other cases in which, during the previous four years, the witness testified as an expert at trial or by deposition; and

(vi) a statement of the compensation to be paid for the study and testimony in the case.

The district court found that the reports submitted by Professor Nagle and Mr. Gaitan failed to meet these requirements. The district court found that the reports "fail to state any actual opinions about which [the experts] will testify, but instead merely recite the general subject matter of their expected testimony" and that the disclosures "lack any of the substance required by Rule 26(a)(2)(B)."

The district court did not abuse its discretion. Each report provided a single paragraph to explain the expert's anticipated opinion and the basis for it. Neither report stated the expert's anticipated opinion with sufficient specificity to allow Drummond to prepare for rebuttal or cross-examination. Under Rule 37(c)(1), the district court was entitled to exclude the testimonies of the experts. A party who "fails to provide information . . . as required by Rule 26(a) . . . is not allowed to use that information or witness to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1); see also Cooper v. Southern Co., 390 F.3d 695, 726 (11th Cir. 2004).

The plaintiffs argue that the district court should have allowed them to supplement their reports, but we disagree. In May 2004, the district court entered a scheduling order that required the plaintiffs to disclose their expert witnesses by March 15, 2005, and in March 2005, the district court extended the deadline to July 18, 2005. Under Rule 26(a)(2)(c), parties must "make [expert] disclosures at the times and in the sequence that the court orders." The plaintiffs failed to provide any sufficient disclosures "as required by Rule 26(a)," before the deadline, so they could not offer any expert witnesses at trial. See Fed. R. Civ. P. 37(c)(1). Their decision to make their disclosures on the deadline, July 18, also meant that there might be no opportunity to supplement the disclosures. Rule 26(e)(2) states that "Any additions or changes to [the disclosure report] must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due." Rule 26(a)(3)(B) provides default deadlines that apply "[u]nless the court orders otherwise." The district court ordered otherwise; it provided an extended deadline of July 18, at which time disclosure reports and any supplements were due.

G. *We Need Not Reach the Plaintiffs' Other Arguments*.

The plaintiffs also argue that the district court erred when it granted summary judgment against two of their claims without considering the declarations of Garcia and Rubio, but we need not reach this argument because the

suit proceeded to trial and neither witness testified.  Under Federal Rule of Civil Procedure 61, "[u]nless justice requires otherwise, no error . . . by the court . . . is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment."  This Rule embodies the "well-settled rule that an erroneous ruling which relates to the substantial rights of a party is ground for reversal unless it affirmatively appears from the whole record that it was not prejudicial."  McCandless v. United States, 298 U.S. 342, 347–48, 56 S. Ct. 764, 766 (1936).  Even if we were to conclude that the district court erred, the plaintiffs cannot establish prejudice.

## IV.  CONCLUSION

The judgment of the district court is **AFFIRMED.**