In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 08-1006, 08-1522

LAURA WALSH & DANIEL WALSH,
individually and as administrators of
the Estate of Jason Walsh, deceased,

*Plaintiffs-Appellants,*

*v.*

MICHAEL G. CHEZ and AUTISM AND
EPILEPSY SPECIALTY SERVICES OF ILLINOIS,

*Defendants-Appellees.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 C 4958—**Joan B. Gottschall**, *Judge.*

ARGUED DECEMBER 12, 2008—DECIDED OCTOBER 21, 2009

Before CUDAHY, FLAUM, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* Jason Walsh suffered from autism. When he was five-years-old, his parents sought help from Dr. Michael D. Chez, who specialized in treating autistic children and who did business through his clinic, Autism and Epilepsy Specialty Services of Illinois. Jason's treatment went seriously awry shortly after he developed

pneumonia, and sadly, Jason died on May 9, 2003, of complications from adrenal insufficiency. His mother and father filed this diversity suit in the U.S. District Court for the Western District of Pennsylvania (the state of which they are, and Jason was, a citizen) against Dr. Chez (a citizen of Illinois) and his clinic (which is incorporated and has its principal place of business in Illinois). (We refer to them collectively as Dr. Chez.) At the eleventh hour before trial, the district court granted the Walshes' motion to transfer to the Northern District of Illinois. There Dr. Chez moved for the first time to bar the reports from the Walshes' experts. Both initially and after examining amended reports, the district court concluded that the reports were insufficient and that the Walshes could not prevail. It therefore dismissed their suit with prejudice and later rejected their Rule 59(e) motion and a motion for leave to file a new set of supplemental reports. On appeal, the Walshes argue that the district court abused its discretion and that they should have been entitled to go to trial.

## I

Because this is a medical malpractice case, the facts relating to Jason's treatment help to place the dispute over the expert reports in context. Jason began to display signs of autism as early as age two. Normally, autism is not a life-threatening condition, and many of its symptoms can be addressed with proper treatment. Jason's parents, Laura and Daniel Walsh, turned to Dr. Chez in 2003 for help. He was of the opinion that autistic children could be treated successfully with corticosteriods. After examining

Jason on January 8, 2003, he began treating him the next day with 50 milligrams of prednisone (a powerful corticosteroid) per day; that initial course of treatment lasted for eight weeks. As Dr. Chez acknowledged, prednisone therapy can result in the suppression of cortisol produced by the adrenal gland.

Although prednisone is useful for the treatment of many conditions, it can also have negative side-effects. See Medline Plus, *Prednisone*, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601102.html (last visited Aug. 31, 2009). One such side effect is that it may decrease the person's ability to fight infection. *Id.*; see also record doc. 184-2. A central question in this case is whether it had such an effect on Jason.

Some time around February 11, 2003, Jason developed pneumonia. This was during the time that he was receiving the prednisone treatments supervised by Dr. Chez. His pneumonia, however, was treated by his primary care physician and by personnel at the Children's Hospital of Pittsburgh. On February 25, 2003, approximately two weeks after the pneumonia was diagnosed, and before Jason had fully recovered, Dr. Chez instructed his parents to stop his daily 50 milligram dose and to cut back to two doses a week (still 50 milligrams per dose), on Tuesdays and Fridays. They complied with this order and administered the drug to Jason on Tuesday, February 25, Friday, February 28, and Tuesday, March 4.

On March 1, 2003, Jason developed a high fever of 103 or 104 degrees. His mother Laura called Dr. Chez's office to report this development. Someone from Dr. Chez's office called back on March 3, 2003, and instructed her not to

make any changes in the new prednisone schedule. That evening, Laura took Jason to the emergency room at Children's Hospital. He was admitted the following day, March 4, with a diagnosis of acute adrenal crisis, profound hypotensive shock, and hypoxia. Complications followed, including pulmonary failure, cardiac failure, and infection. Jason was intubated and placed on a ventilator, but eventually his doctors concluded that his chances of recovery were remote, and the decision was made to discontinue life support. Jason died on May 9, 2003, of complications related to adrenal insufficiency.

## II

The Walshes, as we have noted, filed this medical malpractice action in the Western District of Pennsylvania, their home, invoking the court's diversity jurisdiction. Their theory was that Dr. Chez committed malpractice by cutting off Jason's prednisone so abruptly—to a "pulse" dose—instead of weaning him more gradually. The abrupt cessation of the drug left him susceptible to infection, and he in fact succumbed to pneumonia. To support their case, the Walshes submitted expert reports from Dr. James Tucker and Dr. Ira Cheifetz. The case moved forward in the Pennsylvania court until it was almost ready for trial. At that point, the Walshes moved to transfer the case to the Northern District of Illinois, and the court obliged them.

After the transfer, Dr. Chez filed a motion *in limine* asking the court to bar the Walshes' experts from testifying, on the ground in part that they were not qualified to opine on standard of care or causation, and that in

any event they had not identified the relevant standard of care. The last paragraph of the motion asked the court to grant summary judgment in Dr. Chez's favor, if it found that the expert reports had to be excluded. The district court expressed its concern about the lack of articulation of a baseline standard of care and allowed the Walshes to file supplemental reports to remedy this deficiency. They did so, but the court found that the reports were still insufficient. It therefore excluded them from evidence and then dismissed the case for failure to present evidence on the critical element of standard of care. After the case was dismissed, the Walshes moved under FED. R. CIV. P. 59(e) for reconsideration and they proffered yet more supplemental reports from their experts. The district court denied that motion, too, and the Walshes have now appealed.

### III

The central question we must decide is whether the expert reports submitted by Drs. Tucker and Cheifetz were so lacking with respect to standard of care that they were inadmissible, or if instead any weaknesses in those reports should have gone to the weight of the evidence before the jury. If we find that the district court's initial ruling was correct, we must then decide whether the court abused its discretion when it denied the Walshes' Rule 59(e) motion and refused to consider the new set of supplemental reports they proffered with it.

The duty to disclose reports from experts who are expected to testify comes from FED. R. CIV. P. 26(a)(2) and

(b)(4)(A). Rule 26(a)(2)(B) outlines detailed requirements for such a report:

> (B) Written Report. Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain:
>
>> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
>>
>> (ii) the data or other information considered by the witness in forming them;
>>
>> (iii) any exhibits that will be used to summarize or support them;
>>
>> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
>>
>> (v) a list of all other cases in which, during the previous four years, the witness testified as an expert at trial or by deposition; and
>>
>> (vi) a statement of the compensation to be paid for the study and testimony in the case.

This language was added to Rule 26 as part of the 1993 amendments to the rule. The Committee Note explains that "[t]his paragraph imposes an additional duty to disclose information regarding expert testimony suffi-

ciently in advance of trial that opposing parties have a reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses." 1993 Comm. Note, para. (2). See *Romero v. Drummond Co.*, 552 F.3d 1303, 1323-24 (11th Cir. 2008) (rejecting one-paragraph reports that did not provide an adequate basis for rebuttal or cross-examination).

The district court's decision in the Walshes' case loses sight of the purpose of the expert's report. At a pretrial conference held on August 8, 2007, the court said, reasonably enough, that the doctors had to "say what the standard of care is." It explained further that "He has to tell us what would make this legitimate . . . . If there are 20 different ways of doing it, he has to tell us what they are, or at least what the principles are that guide that." At that point, the court granted the Walshes an opportunity to amend their reports, and warned that if the amended reports were also unsatisfactory, the case was over.

On September 13, 2007, the Walshes submitted a new three-page report from Dr. Cheifetz; that report included the following passage:

The standard of care for all licensed physicians practicing medicine and prescribing corticosteriods with children is the same with regard to discontinuing the use of Prednisone . . . . Because corticosteroids suppress a child's endogenous steroid production, the weaning of Prednisone after subacute or chronic usage must allow the child time to resume his/her own steroid production . . . . The standard of care for discontinuing subacute and chronic use of Prednisone

is a national standard . . . . Dr. Chez negligently instructed Mrs. Walsh that daily Prednisone be discontinued and doses be given only on Tuesdays and Fridays . . . . This negligent order on February 25, 2003, resulted in Prednisone being discontinued for two days, 50 mg being given on February 28th, and then discontinued again for three days. This protocol is not accepted in any recognized textbook, is negligent, and not consistent with accepted practice in this circumstance. Because of the decrease in Prednisone dosing, the child's body was deprived of steroids since his own adrenal glands were not producing the necessary steroids after eight weeks of exogenous suppression.

Dr. Tucker's amended report, dated August 17, 2007, was similar:

I am familiar with the use of prednisone in children, including five-year-old children. I use prednisone in my office, and I am familiar with the safety concerns a physician must be aware of when discontinuing prednisone after weeks of use. The issue of adrenal crisis brought on by an abrupt withdrawal from high dose prednisone is the same regardless of the physician's additional training and specialty. Because prednisone suppresses the child's own production of endogenous cortisone, discontinuation of prednisone after sub-acute or chronic usage must give the child's body time to resume its own production of cortisol. . . . Dr. Chez's protocol for high-dose daily prednisone followed by twice weekly pulse

dosaging . . . was not consistent with that which a reasonably careful physician would do in this circumstance.

Both of the Walshes' experts, in these supplemental reports, expressed the opinion that the abrupt discontinuation of prednisone is not consistent with the relevant standard of care. The purpose of these reports is not to replicate every word that the expert might say on the stand. It is instead to convey the substance of the expert's opinion (along with the other background information required by Rule 26(a)(2)(B)) so that the opponent will be ready to rebut, to cross-examine, and to offer a competing expert if necessary.

We note as well that the district court may have been under the misapprehension that the expert reports had to be excluded if they were somehow incomplete. That is not the case: people often put a case together with testimony on one point from one expert, testimony on a second point from a second expert, etc., and evidence from non-experts. Thus, even if the court had been correct that these reports did not suffice by themselves to support the Walshes' entire case, that was no reason to strike them from the record. What the court thought, however, is important: in its view, without these reports, the Walshes had no evidence at all on standard of care. Standard of care is one element that a plaintiff must show in a medical malpractice case. With a failure of proof on one element, a plaintiff cannot prevail, and summary judgment in the defendant's favor is proper.

But, in our view, a careful look at the supplemental reports of Drs. Turner and Cheifetz shows that there

*was* evidence of standard of care in this record. The weight of that evidence might be disputed, but a rational trier of fact would have been entitled to credit these two doctors and conclude that no responsible doctor would cut back a powerful drug like prednisone so abruptly. These expert reports provided Dr. Chez ample notice of the theory against which he had to defend, and they alerted him to the kind of rebuttal and cross-examination he would need to undertake. The fact that there might have been 19 or 20 other responsible ways to handle the drug is of no moment, if these experts were prepared to say that the avenue Dr. Chez chose fell below the standard of care. It also does not matter that there might be a variety of weaning protocols that would be accepted, if the experts express the opinion that the one that Dr. Chez chose was not.

We conclude with a word or two about the remainder of the Walshes' case. In order to prove a medical malpractice case in Illinois (and we note that the district court relied on Illinois law without objection from either party, thus eliminating from the case any possibility that Pennsylvania choice-of-law rules might have dictated a different substantive rule, see *Van Dusen v. Barrack,* 376 U.S. 612 (1964)), a plaintiff must prove "(1) the proper standard of care by which a physician's conduct may be measured, (2) a negligent failure to comply with the applicable standard, and (3) a resulting injury proximately caused by the physician's lack of skill or care." *Massey v. United States,* 312 F.3d 272, 280 (7th Cir. 2002), citing *Simmons v. Garces,* 745 N.E.2d 569, 577 (Ill. App. 2001), and *Diggs v. Suburban Med. Ctr.,* 548 N.E.2d 373, 377 (Ill. App. 1989).

If the standard of care indeed requires a physician not to stop high doses of prednisone abruptly, as Dr. Chez did, then there is no dispute that element 2 of this test is met. At least in his briefs before this court, Dr. Chez has not argued that there was insufficient evidence to reach a jury on causation. So the case does boil down to the standard of care, as the district court recognized.

In our view, the district court erred in concluding that whatever flaws existed in the expert reports that the Walshes submitted went to their admissibility, as opposed to their weight. When one bears in mind the purpose of the Rule 26 reports, there is no reason to find that these reports were insufficient to alert the defendants to the best strategy for combating the Walshes' case.

Because we have concluded that the Walshes were entitled to proceed to trial based on the information they submitted prior to the district court's dispositive ruling, we have no occasion to consider whether the court abused its discretion in denying the motion under Rule 59(e). We observe, however, that there is nothing that would prevent the plaintiffs at trial from submitting any evidence that is consistent with their pretrial disclosures.

The judgment of the district court is REVERSED and the case is REMANDED for further proceedings consistent with this opinion.