[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-10687
_____

D.C. Docket No. 1:09-cv-23462-EGT


MICHAEL KNIGHT,
through Cheryl Denise Kerr, as Personal Representative
and Next-of-Kin,
LATASHA CURE,

                                        Plaintiffs - Appellants,


versus

MIAMI-DADE COUNTY,
a Florida County and Political Subdivision
of the State of Florida,
MIAMI-DADE POLICE DEPARTMENT,
a Government Subdivision of Miami-Dade County,
ROBERT PARKER,
former Director, Miami-Dade Police Department,
Individually and as an Officer of the Miami-Dade
Police Department,
JAMES LOFTUS,
Interim Director, Miami-Dade Police Department,
Individually and as an Officer of the Miami-Dade
Police Department,
OFFICER RYAN ROBINSON,
Individually and as an Officer of the Miami-Dade

Police Department, et al.,

                                    Defendants - Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(May 5, 2017)

Before MARCUS, JILL PRYOR, and SILER,[*] Circuit Judges.

MARCUS, Circuit Judge:

This tragic case began in the late hours of November 12, 2007, when Miami-Dade Police Officers Ryan Robinson and Michael Mendez discharged their firearms at a Cadillac SUV driven by nonparty Frisco Blackwood and carrying plaintiffs Michael Knight and Latasha Cure as passengers. The shots ultimately killed Blackwood and Knight and wounded Cure. Two years later, Knight's estate and Cure individually filed an eleven-count complaint against the officers, the two detectives who questioned Cure on the night of the shooting, Miami-Dade County, the Miami-Dade Police Department, and the directors of the Miami-Dade Police Department, seeking damages for various civil rights violations and claims arising under state law.

---

[*] Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by designation.

2

The court dismissed two of the eleven counts and granted summary judgment to the defendants on five others.  Only Knight's and Cure's civil rights claims and assault and battery claims against the officers survived and proceeded to trial.  The jury ultimately returned a verdict for the defendants on all remaining counts.  After the plaintiffs' motion for a new trial was denied and final judgment was entered for the police officers, the plaintiffs timely appealed.  They alleged error in six different trial rulings that they claim warrant a new trial.  They also challenged the court's grants of summary judgment to the County, the supervising officers, and the detectives who questioned Cure after the shooting.

After careful review, we hold that the trial court did not abuse its considerable discretion in any of the challenged trial rulings.  Further, we conclude that the court did not err in granting summary judgment to the County, the supervising officers, or the detectives.  Accordingly, we affirm.

## I.

## A.

The undisputed facts in this sad case are these: On the evening of November 12, 2007, Officers Ryan Robinson and Michael Mendez of the Miami-Dade Police Department discharged their firearms, killing Frisco Blackwood and Michael

3

Knight[1] and wounding Latasha Cure.  At around 10:00 p.m., Blackwood, Knight,

Cure, and two of their friends left a Miami nightclub in a silver Cadillac SUV.

Blackwood was driving, Knight sat in the front passenger seat, and Cure and her

two friends sat in the second row of seats.  Cure was seated directly behind the

driver.  The two friends were dropped off and Blackwood, Knight, and Cure

continued driving.  The passengers were all unarmed.

The Cadillac was traveling north on North Miami Avenue when a police car

that had been idling at the intersection of North Miami Avenue and Northwest

62nd Street did a U-turn and began to follow it.  The police car was occupied by

Officers Robinson and Mendez, who were on duty as part of the Robbery

Intervention Unit of the Miami-Dade Police Department.  The officers contend that

the Cadillac ran a red light, while the plaintiffs say they were stopped at a red light

when they noticed the police car begin to follow them.  According to Cure's sworn

statement taken shortly after these events, the plaintiffs drove north on North

Miami Avenue, made a right turn on Northwest 67th Street, sped up, drove a few

more blocks, and then made a right turn on Northeast 2nd Avenue, with the

officers in pursuit.  The Cadillac sped up and drove a few more blocks before

---

[1] Knight's claims are raised by Cheryl Kerr, his mother, as his personal representative and next of kin.  Throughout this opinion, any mention of Knight or of claims brought on his behalf are referred to using "Knight" rather than "Kerr."

4

turning right again, now heading westbound on Northwest 65th Street.  The officers also sped up and continued following the Cadillac.

The officers attempted to effect a traffic stop by using their P.A. system to order the Cadillac to pull over.  The Cadillac continued driving and, after crossing North Miami Avenue going west, it entered a dead end and stopped.  The officers parked their car behind the Cadillac, turned on their spotlight, exited the car with guns drawn, and ordered the plaintiffs to exit the Cadillac.

On this much, the parties agree.  But when it comes to the details and the events that followed the cars' arrival at the dead end, the facts become more muddled.  This is because the only surviving passenger of the Cadillac -- Cure -- presented drastically different accounts in her sworn statement taken the morning after the shooting (November 12, 2007), and then later in her deposition, which was conducted some three years and two months later (February 1, 2011).

Detectives Terry Goldston and Richard Raphael of the Miami-Dade Police Department took Cure's sworn statement after the shooting.  According to that statement, when the passengers noticed the police car following them, Knight said, "Oh, shit.  Squally's [police] behind us."  After driving a few more blocks, Blackwood asked Knight, "Should I bring it?"  Knight responded, "Bring it," which Cure said she interpreted as meaning "[d]on't stop for the police officer."  Cure said that when the Cadillac stopped at the dead end, Blackwood's hands were

5

on the steering wheel and the car was in reverse.  The officers approached the car on both the driver's side and the passenger's side.  Blackwood then rotated the steering wheel clockwise and accelerated backward, causing the car to swing toward the officer standing by the driver's side window.  The officer quickly moved to avoid being struck by the car, and then both officers began firing into the moving vehicle.  As the car reversed, Blackwood slumped over to the side and the shots continued; the Cadillac then collided with the police car, two stop signs, and a parked car before it ultimately stopped against a fence.

According to Cure's deposition testimony, however, when the plaintiffs noticed the police car following them, Knight said "something about squallies [police] behind us."  Cure testified that the police car had its headlights off.  At this point, they were traveling approximately fifty miles per hour in a thirty-five mile-per-hour zone.  Blackwood asked Knight what he should do, and Knight responded, "just hit it.  Get out of here."  Cure said that when the Cadillac stopped in the dead end, Blackwood's right hand was down on his right side and his left hand was obscured from her view.  The officers turned on their headlights and spotlights and got out of the car with their guns drawn; one approached the driver's side and the other approached the passenger's side.  Cure then heard a low noise like a "clink" followed by a single shot aimed directly at the driver from the officer standing next to the driver's window; at this point, the car was not moving.  After

6

that shot, Blackwood's body slumped forward and to the right; the car then began to accelerate in reverse. The path of the reversing car forced the officer who had fired on the driver to quickly move to avoid being struck by the car. While the car reversed, the officers continued to fire until the car came to rest against a fence.

The officers' shots ultimately killed Blackwood and Knight. Cure was shot once in her right thigh. After the shooting, Cure was transported to Jackson Memorial Hospital where she underwent surgery to remove the bullet and suture the wound. After the surgery, Detective Goldston approached Cure and said he would drive her home once she was discharged. Rather than go with him, Cure checked herself out of the hospital and left with a friend at about 1:30 a.m. to go back to the scene, where many of her friends had gathered. While she was there, Detective Goldston called Cure's cell phone and told her that he needed to take her statement at the police station. Cure then left the scene with a friend to return to her house.

When Cure got home, Detective Goldston was waiting for her. Cure agreed to accompany him to the police station; they left for the station before she had a chance to go inside and change out of the hospital scrubs she was wearing. They arrived at the police station at about 3:00 a.m. and Cure was placed in a conference room. She remained there for about an hour before Detectives Goldston and Raphael returned to begin their questioning. The Detectives questioned her

7

intermittently for about forty-five minutes and then left her alone for another hour. Cure testified that, while the officers were gone, she "kept dozing off and going back and forth to the bathroom." She also testified that while they were asking her questions, they were writing notes to each other on a napkin and passing the napkin back and forth. At 8:20 a.m., the detectives brought in a court reporter and took an official sworn statement that lasted until 9:13 a.m. Cure testified that, by this point, her pain medication was wearing off and her wound was bleeding through her hospital scrubs. After she gave her statement, Detective Goldston drove her home.

B.

Two years later, on November 12, 2009, Knight's estate and Cure individually filed an eleven-count complaint in the United States District Court for the Southern District of Florida against Miami-Dade County, the Miami-Dade Police Department, Former Police Department Director Robert Parker, Interim Police Department Director James Loftus, Officer Robinson, Officer Mendez, Detective Goldston, and Detective Raphael. The counts included § 1983 claims by Knight and Cure against Miami-Dade County, the Miami-Dade Police Department, Officer Robinson, and Officer Mendez for violations of the Fourth, Fifth, Eighth, and Fourteenth Amendments due to excessive use of force (Counts 1, 2, 9, and 10); wrongful-death claims by Knight against the County, the Police Department,

8

Officer Robinson, and Officer Mendez (Counts 3 and 4); assault and battery claims by Knight and Cure against the County, the Police Department, Officer Robinson, and Officer Mendez (Counts 5, 6, 7, and 8); and a § 1983 claim by Cure against Detectives Goldston and Raphael for violations of the Fourth, Fifth, Eighth, and Fourteenth Amendments due to coercive interrogation (Count 11).

All of the defendants moved to dismiss the complaint based on qualified immunity, immunity under Florida law, and failure to state a claim. The court dismissed the Miami-Dade Police Department from the action entirely, and it also dismissed the state-law claims against the County. The court denied the motion to dismiss the remaining nine counts. The case was then referred to a magistrate judge, with the consent of all parties, for further proceedings including trial. See Fed. R. Civ. P. 73(a).

After discovery, all of the defendants moved for summary judgment on the remaining counts. Officers Robinson and Mendez and Detectives Goldston and Raphael argued that they were entitled to qualified immunity, while the County claimed that it was immune from suit on the state-law claims and that the plaintiffs had failed to show the existence of an official policy or an unofficial custom or practice necessary to subject the County to liability. Directors Parker and Loftus moved for summary judgment as well, urging that they, too, were entitled to

9

qualified immunity and that they had never been named in any counts of the complaint.

The court ultimately granted summary judgment to the County, Directors Parker and Loftus, and Detectives Goldston and Raphael on all counts levelled against them, as well as on the wrongful-death claims pending against Officers Robinson and Mendez. However, the court denied summary judgment on the assault and battery and § 1983 claims against Officers Robinson and Mendez, concluding that the officers were not entitled to qualified immunity. Officers Robinson and Mendez appealed the denial of summary judgment. On December 19, 2013, a panel of this Court affirmed the denial of summary judgment in an unpublished decision. See Knight v. Miami-Dade Cty., 548 F. App'x 607, 608 (11th Cir. 2013). We concluded that the court did not err in finding that genuine issues of material fact remained regarding the officers' conduct. Id.

When the case returned to the trial court, the court made several rulings on evidentiary issues including, as relevant to this appeal, the admissibility of various expert witnesses' testimony and the admissibility of criminal-history evidence. Trial started on June 9, 2014. Among other rulings, the trial court limited the plaintiffs' cross-examination of the defendants' police-practices expert to one hour. Evidence of the Police Department's pursuit policy, proffered by the plaintiffs, was excluded. And the trial court declined to give a jury instruction that had been

10

requested by the plaintiffs -- that "the Defendants are not justified in using deadly force if their own objectively unreasonable actions created the very risk that generated the eventual use of deadly force."

After the plaintiffs rested their case, the defendants moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a).  The trial court deferred ruling on the motion, and, after the defendants rested, they renewed the motion.  At the conclusion of the trial but before the case was submitted to the jury, the plaintiffs in turn moved pursuant to Rule 50(b) for judgment in their favor on all affirmative defenses; again, the trial court reserved ruling until after the jury's verdict.

On June 19, 2014, jury instructions were given and the jury began its deliberations.  After seven hours of deliberation spanning two days, the jury informed the court that it was ready to consider itself a hung jury.  The judge ordered them to continue deliberating and, eventually, the parties consented to receiving a verdict by a supermajority (at least six to two).  The jury ultimately rendered its verdict by a vote of seven to one for the defendants on all counts.  As for Knight, the verdict questions read this way:

1. Do you find from the greater weight of the evidence in Plaintiff Michael Knight's favor on the federal claim of excessive use of force against Defendant Ryan Robinson?
   . . .
2. Do you find from the greater weight of the evidence in Plaintiff Michael Knight's favor on the federal claim of excessive use of force against Defendant Michael Mendez?

11

. . .

3. Do you find from the greater weight of the evidence in Plaintiff Michael Knight's favor on the state law claims of assault and/or battery against Defendant Ryan Robinson?

. . .

4. Do you find from the greater weight of the evidence in Plaintiff Michael Knight's favor on the state law claims of assault and/or battery against Defendant Michael Mendez?

The jury answered each question in the negative; again, the split was seven to one. The same verdicts were rendered for Cure.

After the verdict, the plaintiffs moved for a new trial. They alleged that the trial court committed error in excluding evidence of any violations of the Police Department's pursuit policy, admitting testimony from the defendants' police-practices expert, failing to give the jury a proffered instruction, and admitting some criminal-history evidence. The trial court entered an omnibus order finding no error on any of the points raised and resolving certain other disputed issues about costs. Accordingly, an amended final judgment was entered on the same day reflecting the apportionment of costs between the parties. The plaintiffs timely appealed.

## II.

This is undoubtedly a heartbreaking case. But on appeal, the plaintiffs do not argue that the jury's verdict was rendered against the substantial weight of the evidence. Rather, Knight and Cure say that six discrete errors entitle them to a

12

new trial: the inclusion of the defendants' police-practices expert; the exclusion of

the plaintiffs' ballistics and reconstruction experts; the exclusion of evidence

showing violations of the Police Department's pursuit policy; the refusal to give a

specific jury instruction; the admission of some criminal-history evidence; and,

finally, the failure to address the prejudicial nature of the defendants' opening and

closing statements.

"A timely motion for new trial is addressed to the sound judicial discretion

of the trial court"; therefore, "[a] decision denying a new trial motion is reviewable

only for an abuse of that discretion." Hercaire Int'l, Inc. v. Argentina, 821 F.2d

559, 562 (11th Cir. 1987). In evaluating whether specific trial errors warrant a new

trial, we apply the harmless-error standard of Fed. R. Civ. P. 61. In accordance

with Rule 61, we will conclude "that a new trial is warranted only where the error

has caused substantial prejudice to the affected party (or, stated somewhat

differently, affected the party's 'substantial rights' or resulted in 'substantial

injustice')." Peat, Inc. v. Vanguard Research, Inc., 378 F.3d 1154, 1162 (11th Cir.

2004). We take each alleged trial error in turn.

A.

Knight and Cure first say that they are entitled to a new trial because the trial

court erred in admitting testimony from W. Kenneth Katsaris, the defendants'

police-practices expert. Katsaris was called as a rebuttal expert to the plaintiffs'

13

police-practices expert, Robert Pusins. Pusins had testified that the officers'

behavior was objectively unreasonable under the circumstances of this case. In

rebuttal, Katsaris testified that the officers "acted objectively reasonabl[y] and in

accordance with what is recognized as training throughout the country." Before

trial, both sides moved to exclude the others' police-practices witness for various

reasons; the trial court denied these motions to the extent that they sought to

exclude the witnesses entirely, but it did place limits on the scope of the testimony.

Specifically, the court ruled that the police-practices experts could not be

questioned on "the constitutionality of the Miami-Dade Police Department's

policies" or on "any ballistics, bullet projectile, or accident reconstruction issues,"

and that they could not "testify, reference, or analyze any caselaw before the jury."

After the verdict, the plaintiffs argued that the inclusion of the defendants' expert

entitled them to a new trial.

"We review for abuse of discretion the district court's decisions regarding

the admissibility of expert testimony and the reliability of an expert opinion."

United States v. Frazier, 387 F.3d 1244, 1258 (11th Cir. 2004) (en banc); see also

Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999) ("[A] court of

appeals is to apply an abuse-of-discretion standard when it reviews a trial court's

decision to admit or exclude expert testimony.") (quotations and alterations

omitted). Under this standard, "we must affirm unless we find that the district

14

court has made a clear error of judgment, or has applied the wrong legal standard."

Frazier, 387 F.3d at 1259.

The starting point in our analysis is found in Rule 702 of the Federal Rules of Evidence, which controls the admission of expert testimony. Id. Rule 702 says:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; see also Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589 (1993) ("[T]he trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable. The primary locus of this obligation is Rule 702, which clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify.").

Rule 702 requires the district court to perform a critical gatekeeping function regarding the admissibility of expert testimony. See Frazier, 387 F.3d at 1260. We employ a rigorous three-part inquiry to review the admissibility of expert testimony under Rule 702. Under this framework, the trial court must consider whether:

15

(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

Id. (quotations omitted).

The proponent of the expert testimony bears the burden of establishing that each of these criteria are satisfied. Id. As for qualification, experts may be deemed qualified in a variety of ways including by "knowledge, skill, experience, training, or education." Id. at 1261 (quoting Fed. R. Evid. 702) (emphasis omitted). As for reliability, the Supreme Court has said that "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." Kumho Tire, 526 U.S. at 152; see also Frazier, 387 F.3d at 1262. Finally, expert testimony assists the trier of fact "if it concerns matters that are beyond the understanding of the average lay person." Frazier, 387 F.3d at 1262. Thus, "[p]roffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." Id. at 1262–63.

On this record, there was no error (let alone a clear error of judgment) in permitting Katsaris to testify. The plaintiffs first claim that Katsaris's opinions were not grounded in reliable principles and methods because "[h]e did not examine the scene, the vehicles involved, the pursuit route, photographs of the

16

area, or post-incident photographs of the vehicles and bodies." However, these claims are contradicted by Katsaris's very testimony that he reviewed "statements taken in the case of officers and those present," "reviewed all the evidence and information that's in the file," "read, reviewed, looked at photos," went to the scene of the shooting the night before giving his testimony, drove through the route twice, and "read and reviewed how the incident occurred." The plaintiffs have not provided any support for their argument that these methods were unreliable. And notably, these are virtually the same preparations that Pusins, the plaintiffs' own police-practices expert, took before testifying. The trial court did not abuse its discretion in finding Katsaris's expert opinion to be sufficiently reliable and grounded on sound principles and methods.

The plaintiffs also argue that Katsaris's testimony was inadmissible because he relied on various hearsay statements to create a justification for the officers' actions. But, as we have long recognized, an expert may rely on hearsay evidence as part of the foundation for his opinion so long as the hearsay evidence is "the type of evidence reasonably relied upon by experts in the particular field in forming opinions or inferences on the subject." United States v. Scrima, 819 F.2d 996, 1002 (11th Cir. 1987); see also Daubert, 509 U.S. at 592 (noting that experts are given "wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation"). Katsaris relied on hearsay statements made

17

by those present at the scene in concert with his review of the photographs, investigative reports, forensic reports, and Cure's testimony, just as Pusins did. This evidence is precisely the kind reasonably relied on by experts in the field, and the trial court did not abuse its discretion in allowing the expert's testimony.

Relatedly, the plaintiffs urge that Katsaris's opinion is inadmissible for the additional reason that it was not based on facts available to the officers at the time of the critical events. Specifically, the plaintiffs object to the expert's reliance on Cure's testimony that Blackwood refused to put the car in park when she told him to and that the occupants could see the officers out of the window despite the tinting. The plaintiffs say that Katsaris improperly relied on these statements, which were facts not known to the officers at the time, to form his opinion that Blackwood deliberately backed the car into the officers, creating a reasonable basis for the officers' use of deadly force.

It is true that in excessive-force cases, "[t]he question is whether the officer's conduct is objectively reasonable in light of the facts confronting the officer." Durruthy v. Pastor, 351 F.3d 1080, 1093 (11th Cir. 2003) (quotations omitted). The defendants do not dispute that what was said inside the Cadillac was unknown to the officers at the time. But Katsaris testified that he relied on Cure's statements to corroborate the officer's testimony, not to reach independent conclusions based on those statements. As Katsaris explained, regardless of the

18

passengers' statements inside the car at the time, the officers knew (and testified) that the car was placed in reverse and moving toward them, and that fact alone (if credited by the jury) was enough to allow the officers to use deadly force. And even if it fairly could be said that Katsaris improperly relied on Cure's statements, the plaintiffs had an opportunity to question his use of those statements both during his deposition and again at trial. They did not do so and they have not established any prejudice from the use of the statements by the expert.

Moreover, to the extent the plaintiffs suggest that Katsaris was not a credible witness, the jury was free to make that determination on its own. Katsaris was called as a rebuttal witness to Pusins. Which expert to believe and how much of his testimony to credit were basic determinations for the jury to make based on everything it heard; again, the court properly permitted both experts to testify. See Rink v. Cheminova, Inc., 400 F.3d 1286, 1293 n.7 (11th Cir. 2005) ("[A] district court may not exclude an expert because it believes one expert is more persuasive than another expert. . . . Vigorous cross-examination ensures that these issues of general credibility are properly presented for consideration by the trier of fact.").

The plaintiffs' last argument regarding Katsaris is that the trial court abused its discretion by limiting the time available for cross-examination. "We review the district court's decisions limiting cross-examination for abuse of discretion." United States v. Orisnord, 483 F.3d 1169, 1178 (11th Cir. 2007). After thirty

19

minutes of cross-examination, which was primarily spent challenging Katsaris's qualifications, the following exchange occurred:

> THE COURT: Come up here, please.
>
> [Proceedings at sidebar follow]:
>
> THE COURT: Mr. Allen, we have now consumed 30 minutes of your examination of which the value in terms of focusing on the issues that relate to what this jury have to decide has hardly been covered.
>
> I'm putting you on a clock. You have 20 minutes. If you want to focus 20 minutes on that, you can do so. All I'm telling you, as a friendly observer, you are losing the jury, and it's not fair to the plaintiff at the conclusion of the trial.
>
> Your examination will end at 20 after. Whatever you're going to cover, you're going to cover.
>
> [Plaintiffs' Counsel 1]: We are allowed the same amount as defendant?
>
> [Plaintiffs' Counsel 2]: This witness is very difficult to deal with.
>
> THE COURT: No, he is not. If you want to take time to do that, I'm not going to stop you. All I'm telling you, as a friend of the Bar, you're losing the jury. You do not want to lose the jury on the last day of the trial.
>
> With that, go.

The plaintiffs then proceeded in their cross-examination for another thirty minutes, resulting in an hour-long exchange.

On appeal, the plaintiffs allege that "[f]ifty minutes was not enough for the jury to understand the factual misunderstandings and unreliable methods underlying the opinions." But the plaintiffs have not identified anything that they would have asked Katsaris that they did not have an opportunity to ask during cross-examination. The fact that the defendants were given eighty minutes to

20

cross-examine the witness in comparison to the plaintiffs' sixty minutes does not, on its own, result in substantial injustice to the plaintiffs. The plaintiffs' claim seems to be that they did not have time to call into question Katsaris's belief that Officer Robinson was behind the car rather than beside it, a fact that was central to his conclusions. But they did explore those topics during the time they had, and they have not identified for us any additional questions they would have posed to show how they were prejudiced by this limitation.

We have "stress[ed] the broad discretion district courts have in managing their cases." Chrysler Int'l Corp. v. Chemaly, 280 F.3d 1358, 1360 (11th Cir. 2002). In the absence of any identifiable prejudice to the plaintiffs, we cannot find any abuse of discretion. In short, none of the trial court's rulings concerning Katsaris's expert testimony warrants a new trial.

B.

Knight and Cure also argue that the trial court erred in excluding their ballistics and reconstruction experts. The court's original scheduling order called for the disclosure of expert witnesses' reports by December 31, 2010; the production of rebuttal expert witnesses' reports by January 21, 2011; and the completion of all expert discovery by February 4, 2011. The plaintiffs disclosed their expert witnesses thirty-five days late, on February 4, 2011. This list included trajectory reconstructionist Sharon Ballou and accident reconstructionist Miles

21

Moss (or, alternatively, his son Aaron Moss).  The defendants objected to the discovery requests and disclosures as untimely, and the plaintiffs then moved for leave to modify or extend the scheduling order.  The trial court eventually issued a new pretrial schedule that continued the trial by 188 days and required expert discovery to be completed by September 12, 2011, which was 220 days after the original deadline.  The court also allowed the plaintiffs' medical expert, John Marraccini, and their police-practices expert, Pusins, to testify, even though their summaries were untimely filed.  However, the court excluded Ballou and the Mosses because the plaintiffs did not show "substantial justification for their untimely disclosure," and because "permitting discovery regarding these experts would impose undue prejudice on Defendants."  The plaintiffs now argue that this exclusion warrants a new trial.

We also review the trial court's decision to exclude late-disclosed witness testimony for an abuse of discretion.  See Romero v. Drummond Co., Inc., 552 F.3d 1303, 1313–14 (11th Cir. 2008).  "Discretion means the district court has a range of choice, and that its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law."  Betty K Agencies, Ltd. v. M/V Monada, 432 F.3d 1333, 1337 (11th Cir. 2005) (quotations omitted).  "[I]n evaluating whether the exclusion of a late witness was an abuse of discretion, an appellate court should consider the explanation for the failure to disclose the

22

witness, the importance of the testimony, and the prejudice to the opposing party if the witness had been allowed to testify." Romero, 552 F.3d at 1321 (quotations and alteration omitted).

Discovery procedures are governed by Fed. R. Civ. P. 26. Specifically, Rule 26(a)(2)(D) requires the disclosure of expert testimony "at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D). Absent a court order saying otherwise, disclosure of expert testimony must occur "at least 90 days before the date set for trial or for the case to be ready for trial." Fed. R. Civ. P. 26(a)(2)(D)(i). Thus, Rule 26(a)(2)(D)(i) sets a default deadline in the event that the trial court does not set its own schedule. While a court may "grant a post hoc extension of the discovery deadline for good cause, it [is] under no obligation to do so" and, "in fact, we have often held that a district court's decision to hold litigants to the clear terms of its scheduling orders is not an abuse of discretion." Josendis v. Wall to Wall Repairs, Inc., 662 F.3d 1292, 1307 (11th Cir. 2011). If a party fails to disclose information or witnesses required by Rule 26, it may still be allowed to use that information or witness provided that "the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "Substantially justified means that reasonable people could differ as to the appropriateness of the contested action." Maddow v. Procter & Gamble Co., Inc., 107 F.3d 846, 853 (11th Cir. 1997).

23

It is undisputed that the plaintiffs' disclosures were untimely under the court's original scheduling order, which required disclosures to be made 151 days before trial. The plaintiffs nevertheless argue that their disclosures were timely under Rule 26, which requires disclosures at least ninety days before trial, and that the court abused its discretion in excluding their experts because the potential harms to the defendants were limited given the 188-day delay of the trial. But Rule 26 provides the controlling deadline only in the absence of a scheduling order issued by the trial court. See Fed. R. Civ. P. 26(a)(2)(D) (providing deadlines that apply "[a]bsent a stipulation or a court order"). When, as in this case, the court has entered a scheduling order, the court's deadlines control. The fact that the disclosures complied with the general default deadlines embodied in the Federal Rule is therefore irrelevant because the disclosures did not comply with the trial court's unambiguous deadlines.

The plaintiffs argue, nonetheless, that exclusion was an abuse of discretion because their untimeliness was "substantially justified or [ ] harmless" under Rule 37(c)(1). The trial court rejected this argument, too, in its order excluding the experts, concluding that the plaintiffs had not shown any justification for their tardiness and that the defendants would be unduly prejudiced if the experts were included. There was no abuse of discretion in this conclusion. The plaintiffs' reasons for their untimeliness were an unavailability of funds to secure expert

24

services and a belated realization that ballistics and reconstruction experts would be necessary. But even assuming that financial difficulties would justify an extension, the plaintiffs failed to move for an extension until the deadline had already expired and did not provide any notice to the trial court that they were experiencing such difficulties. Moreover, the court's first scheduling order was issued in July 2010 and required the disclosure of experts in October 2010; in November 2010, the court pushed that deadline back to December 23, 2010. The plaintiffs thus had at least five months' notice to gather their experts and they have not carried their burden of showing a substantial justification for their tardiness.

But even if the exclusion of these experts amounted to an abuse of discretion, the plaintiffs have failed anyway to establish substantial harm. See Josendis, 662 F.3d at 1307. The plaintiffs were permitted to introduce the testimony of their forensic-pathology expert, Marraccini, who testified regarding the positions of the officers when the shooting took place. Marraccini was permitted to rely on reports prepared by Miles Moss, and he cited data and results from Moss's reports in his trial testimony. Given the reconstruction evidence that was presented at trial, it is difficult to see how the plaintiffs suffered substantial harm by the exclusion of their reconstruction experts. Accordingly, the plaintiffs have not shown that the ruling "resulted in substantial harm to [their] case." Id. (quotation omitted). "Although the district court may have had discretion to admit

25

an untimely report, it did not abuse its discretion to exclude it as untimely in the circumstances under which the [plaintiffs] offered it."  Bearint ex rel. Bearint v. Dorel Juvenile Grp., Inc., 389 F.3d 1339, 1349 (11th Cir. 2004) (citation omitted).

C.

Knight and Cure next contest the exclusion of the Miami-Dade Police Department's pursuit policy.[2]  The plaintiffs wanted to introduce evidence and testimony at trial that the officers allegedly violated the pursuit policy; the trial court decided to exclude this evidence due to its attenuation from the circumstances preceding the use of force at issue in the case.  On appeal, the plaintiffs argue that this evidence was improperly excluded for two reasons.  First, they say that by violating the Police Department's pursuit policy, the officers "created the very risk that generated the eventual use of deadly force," which alone should deprive them of qualified immunity.  Second, the plaintiffs argue that the defendants "opened the door to introduction of the chase policy" because, in opening statements, the defendants said that "for every action there's an equal and opposite reaction."  The trial court disagreed on both counts and refused to admit

[2] In the district court, the only direct reference to the pursuit policy was in the plaintiffs' motion for a new trial; the policy itself was never entered into the record.  The citation and quotation are repeated in the plaintiffs' opening brief on appeal.  According to these quotations, the relevant policy says: "Officers may only engage in pursuits when they have a reasonable belief that the fleeing subject has committed or attempted to commit a felony which involves the use or threat of physical force or violence to a person.  All other pursuits are prohibited."

the evidence; it reaffirmed that conclusion in its denial of the plaintiffs' motion for a new trial.

Again, "we review the district court's evidentiary rulings for an abuse of discretion, but will reverse only if the error may have had a substantial influence on the outcome of the proceeding." United States v. Augustin, 661 F.3d 1105, 1127 (11th Cir. 2011) (quotation omitted). Consistent with Fed. R. Civ. P. 61, we will "hold that a new trial is warranted only where the error has caused substantial prejudice to the affected party (or, stated somewhat differently, affected the party's 'substantial rights' or resulted in 'substantial injustice')." Peat, 378 F.3d at 1162. On this standard, the plaintiffs' arguments must be rejected.

The trial court excluded this evidence due, in part, to the risk that it would confuse the jurors by leading them to believe that they could find liability based on a violation of the pursuit policy rather than on a violation of the Fourth Amendment. Notably, the plaintiffs do not argue that the officers' alleged violation of the pursuit policy was itself a Fourth Amendment violation. They argue instead that the officers' decision to pursue the Cadillac created a situation that required the use of deadly force. However, many police departments have internal procedures that are more restrictive of conduct than what is otherwise permitted under state and federal law, and the Supreme Court has observed that a violation of these policies "does not itself negate qualified immunity where it

27

would otherwise be warranted." City & Cty. of San Francisco, Ca. v. Sheehan, 135 S. Ct. 1765, 1777 (2015). Thus, the plaintiffs "cannot establish a Fourth Amendment violation based merely on bad tactics that result in a deadly confrontation that could have been avoided." Id. (quotations omitted). Indeed, "so long as a reasonable officer could have believed that his conduct was justified," a plaintiff cannot succeed "by simply producing an expert's report that an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate, or even reckless." Id. (quotations omitted). The risk of confusing the jury on this point was not insubstantial, and the court did not abuse its considerable discretion by trying to mitigate that risk.

Moreover, the probative value found in this evidence was decreased measurably because it concerned events that were temporally separated from the actual use of force. As we have said, "[i]n determining whether the officers in this case are entitled to qualified immunity, we analyze the precise circumstances immediately preceding [the victim's] being shot" rather than more-attenuated events that occurred before and after the shooting. Carr v. Tatangelo, 338 F.3d 1259, 1270 (11th Cir. 2003). It was within the trial court's discretion to conclude that an alleged violation of the pursuit policy fell outside of this window. After Officers Robinson and Mendez began following the Cadillac, the cars drove for approximately six-tenths of a mile before coming to a stop at the dead end. Cure

28

testified that after the cars stopped, approximately two minutes passed between the moment the officers exited their car and the moment that the first shot was fired; during those two minutes, the officers were issuing commands and asking the occupants to exit the Cadillac with their hands up.  The trial court carefully considered the temporal separation between any claimed pursuit-policy violation and the moment that shots were fired, and it concluded that the relevant violations were only those that occurred after the cars stopped.  This was a careful, fact-bound decision.  We cannot say that it amounted to an abuse of discretion.

D.

The plaintiffs next argue that the trial court erred in failing to give their proposed jury instruction based on Swofford v. Eslinger, 671 F. Supp. 2d 1289 (M.D. Fla. 2009), and Kirby v. Duva, 530 F.3d 475 (6th Cir. 2008).  "We review only for abuse of discretion a district court's refusal to give a requested jury instruction."  Pensacola Motor Sales Inc. v. E. Shore Toyota, LLC, 684 F.3d 1211, 1224 (11th Cir. 2012).  When evaluating a trial court's failure to give a requested instruction, "the omission is error only if the requested instruction is correct, not adequately covered by the charge given, and involves a point so important that failure to give the instruction seriously impaired the party's ability to present an effective case."  Wood v. President & Trs. of Spring Hill Coll., 978 F.2d 1214, 1222 (11th Cir. 1992).

29

The plaintiffs proposed telling the jury that "the Defendants are not justified in using deadly force if their own objectively unreasonable actions created the very risk that generated the eventual use of deadly force."  This instruction was based on language drawn from Swofford, in which a district court said that "defendants cannot claim the protection of qualified immunity when their own objectively unreasonable actions created the very risk that generated the eventual use of deadly force."  Swofford, 671 F. Supp. 2d at 1305 (quotations and alteration omitted).  In reaching this conclusion, the trial court in that case relied on case law from the Western District of Michigan and the Sixth and Seventh Circuits.  See id. (quoting Bletz v. Gribble, 640 F. Supp. 2d 907, 919 (W.D. Mich. 2009), and citing Yates v. City of Cleveland, 941 F.2d 444, 447 (6th Cir. 1991), and Kirby, 530 F.3d at 482).[3]  The jury instructions that were ultimately given in this case did not include the Swofford language.

We see no abuse of discretion in excluding this instruction.  It was proposed as an instruction on "§ 1983 Excessive Force" and is related to the question whether Officers Robinson and Mendez were entitled to qualified immunity.  If the officers' conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known," then they would not be entitled to

---

[3] The district court's opinion in Swofford was affirmed by this Court without argument in an unpublished per curiam opinion.  See Swofford v. Eslinger, 395 F. App'x 559 (11th Cir. 2010). That opinion did not, however, discuss the language at issue in this case.

30

qualified immunity.  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The district court therefore was required to instruct the jury on the clearly established law applicable to the plaintiffs' excessive-force claim.  See Ansley v. Heinrich, 925 F.2d 1339, 1347 (11th Cir. 1991).  Because there is no decision from the Supreme Court, this Circuit, or the Florida Supreme Court clearly establishing that the plaintiffs' requested instruction is a correct statement of the law, the district court acted within its discretion in declining to give it.

Further, the plaintiffs' proposed instruction suggests that if the officers acted unreasonably in pursuing the plaintiffs, then they would not be entitled to qualified immunity because they created the circumstances that ultimately led to the fatal use of force.  The district court concluded, however, that any connection between the officers' pursuit (which may have violated the pursuit policy) and their use of deadly force was attenuated.  The plaintiffs' proposed instruction thus risked confusing the jury regarding which violations could give rise to liability.  Given the trial court's decision to exclude the pursuit policy and our decision that that was not an abuse of discretion, the exclusion of this instruction was not error either.

To the extent that the plaintiffs suggest that the pursuit itself constituted a separate Fourth Amendment violation, they have provided no evidence suggesting that the officers' pursuit independently violated clearly established law.  "In this

31

circuit, rights are 'clearly established' by decisions of the Supreme Court, this court, or the highest court of the state in which the case arose." Thomas ex rel. Thomas v. Roberts, 323 F.3d 950, 953 (11th Cir. 2003). The plaintiffs have again offered no cases from the United States Supreme Court, the Eleventh Circuit, or the Florida Supreme Court, and thus they cannot show that a reasonable officer would have known that his conduct was violating clearly established law. See D'Aguanno v. Gallagher, 50 F.3d 877, 881 n.6 (11th Cir. 1995).

In any event, the instruction given on excessive force was proper and largely tracked this Court's pattern jury instruction on excessive force in § 1983 actions. See Eleventh Circuit Civil Pattern Jury Instructions § 5.2 (2013). "So long as the instructions accurately reflect the law, the trial judge is given wide discretion as to the style and wording employed in the instructions." United States v. Starke, 62 F.3d 1374, 1380 (11th Cir. 1995). The trial court did not abuse its discretion by giving a correct jury instruction.

E.

Next, Knight and Cure argue that the trial court fatally erred in admitting evidence of Blackwood's and Cure's criminal histories. "We review questions regarding the district court's admission of evidence for abuse of discretion." Williams v. Mast Biosurgery USA, Inc., 644 F.3d 1312, 1316 (11th Cir. 2011).

32

Again, we will "hold that a new trial is warranted only where the error has caused substantial prejudice to the affected party." Peat, 378 F.3d at 1162.

The plaintiffs moved in limine to exclude Blackwood's and Cure's criminal histories. Blackwood had four prior felony convictions for burglary. All but his most recent conviction were excluded by the trial court, and that conviction was allowed because it was "material to the defense theory that his earlier conviction and his probation status caused him to initiate, and refuse to cease, flight when confronted by the officers." The defendants argued that because Blackwood was due to appear in court the next day for a probation hearing, he had reason to flee from the officers rather than pull over. If he had pulled over, he would have been caught associating with other people on probation (Knight and Cure) -- which might have put his probationary status at risk.

As for Cure, she had at least four felony convictions, which included crimes of falsehood and fraudulent use of another's identification, grand theft, and at least two other convictions. The trial court concluded that her convictions for crimes of falsehood and fraudulent use of another's identification were admissible, as was her conviction for grand theft. Her other convictions were deemed inadmissible under Rule 403 because they were cumulative. The plaintiffs now appeal the admission of any criminal-history evidence, arguing that this evidence was "unduly

33

prejudicial" and that there was "no nexus between the criminal charges, convictions, or misconduct and the issues pending in the case."

Two rules of evidence specifically relate to criminal-history evidence.  The first, Rule 404(b), governs evidence of prior crimes, wrongs, or acts, and it provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b)(1).  However, this evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(2).  The second, Rule 609(a), governs the admissibility of evidence of a criminal conviction when it is offered for impeachment purposes.  This rule, in turn, requires that any "prior convictions of a non-defendant witness be admitted if (1) the convictions are for crimes punishable by death or imprisonment in excess of one year, (2) the convictions are less than ten years old, and (3) the evidence is being used to attack the witness'[s] credibility."  United States v. Burston, 159 F.3d 1328, 1335 (11th Cir. 1998).  Prior-conviction evidence governed by Rule 609(a)(1) (like all proffers of evidence) is still subject to Rule 403's balancing test, meaning that "[e]vidence that is otherwise admissible under Rule 609(a)(1) is to be excluded 'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of

34

the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.'" Id. at 1336 (quoting Fed. R. Evid. 403). In addition, Rule 609(a)(2) allows for the admission of a prior conviction "if the court can readily determine that establishing the elements of the crime required proving -- or the witness's admitting -- a dishonest act or false statement." Fed. R. Evid. 609(a)(2).

Again, we hold that the trial court did not abuse its broad discretion. As for Blackwood's criminal history, the evidence was plainly admissible under Rule 404(b) to establish his motive to flee from Officers Robinson and Mendez. Blackwood, Knight, and Cure were all on probation at the time, and Blackwood had a probation hearing the next day. Evidence of Blackwood's most recent conviction, for which he was then on probation, was therefore probative of his motive to flee from the officers: had he pulled over, he would have been caught associating with other people on probation, which might have jeopardized his probationary status. Given the plain text of this rule, and the fact that the trial court expressly limited evidence of Blackwood's prior convictions to only the conviction for which he was on parole, there was no abuse of discretion.

Regarding Cure's criminal history, the defendants sought to introduce this evidence for impeachment purposes. Such evidence "must be admitted, subject to Rule 403, in a civil case." Fed. R. Evid. 609(a)(1)(A). Rule 403's balancing test

35

does not favor exclusion in this case.  This Court has previously recognized that "[t]he implicit assumption of Rule 609 is that prior felony convictions have probative value."  Burston, 159 F.3d at 1335.  Because this is a civil case, we see less danger of unfair prejudice.  As for Cure's convictions for crimes of falsehood and fraudulent use of another's identification, these convictions were admissible under Rule 609(a)(2), which requires the admission of crimes involving "a dishonest act or false statement."  Fed. R. Evid. 609(a)(2).  The trial court did not abuse its discretion in admitting this evidence.

Two additional points warrant further comment.  First, our case law provides no support for the plaintiffs' suggestion that there must be a "nexus between the criminal charges, convictions, or misconduct and the issues pending in the case."  Evidence of Cure's prior convictions was relevant for impeachment, see Fed. R. Evid. 609, and evidence of Blackwood's prior conviction was relevant to offer a reason for his flight, see Fed. R. Evid. 404(b).  No more "nexus" is required.

Second, the plaintiffs urge that the trial court erred in admitting Cure's testimony that she "smoked marijuana every day before the police shooting."  While this is not an argument that the trial court improperly admitted evidence of Cure's criminal history, the plaintiffs argue that this testimony had the same prejudicial effect.  We have previously recognized the "extreme potential for unfair prejudice flowing from evidence of drug use," and we have "held that such

36

evidence may properly be limited to specific instances of drug use during relevant periods of trial and the transaction" at issue in the case. United States v. Sellers, 906 F.2d 597, 602 (11th Cir. 1990) (quotations and alteration omitted); accord Jarrett v. United States, 822 F.2d 1438, 1446 (7th Cir. 1987) ("A witness's use of drugs may not be used to attack his or her general credibility, but only his or her ability to perceive the underlying events and testify lucidly at the trial."). When, in this case, the plaintiffs asked for the evidence of drug use to be excluded, the trial court acted in conformity with our precedent: the Court informed the jury that Cure's drug use "could not be used to attack her credibility but only to evaluate her ability to perceive and recall events." This limiting instruction was appropriate and limited any unfair prejudice that might otherwise have arisen from the admission of such evidence. Plainly, the jury was entitled to consider Cure's use of drugs in evaluating her ability to recount the critical events as they unfolded that night. Thus, there was no abuse of discretion.

### F.

Knight and Cure's final argument regarding the trial is that the defendants' opening and closing statements were so prejudicial that they require a new trial. "We review for an abuse of discretion the decisions of the district court to regulate closing arguments of counsel." Goldsmith v. Bagby Elevator Co., Inc., 513 F.3d 1261, 1275 (11th Cir. 2008). The trial court has "considerable discretion to control

37

the tone of counsels' arguments and, absent an abuse of discretion, the decision of the trial court, which has had the opportunity to hear the offensive remarks within the context of the argument and to view their effect on the jury, should not be disturbed." Allstate Ins. Co. v. James, 845 F.2d 315, 318 (11th Cir. 1988). "For reversible error to be found in a closing argument, the challenged argument must be plainly unwarranted and clearly injurious." Goldsmith, 513 F.3d at 1282 (quotations omitted). The comments must have been "of a nature to impair calm and dispassionate consideration by the jury." Allstate, 845 F.2d at 318.

The plaintiffs challenge the closing statements for the first time on appeal, so we need not, and will not, address it now. See Access Now, Inc. v. Sw. Airlines Co., 385 F.3d 1324, 1335 (11th Cir. 2004) ("We will not address a claim . . . that is being raised for the first time on appeal, without any special conditions."). The plaintiffs did not object during the defendants' closing statements, nor did they raise any claims regarding the closing statements in their motion for a new trial. Thus, they gave the trial court no opportunity to address the "offending comments." The plaintiffs have waived this argument. See Cummings v. Dep't of Corr., 757 F.3d 1228, 1234 (11th Cir. 2014).

The plaintiffs also argue that they were prejudiced because in opening statements, defense counsel argued that "the plaintiffs committed crimes and lacked credibility because of drug use, speculated about the dead driver's

38

intentions, and inaccurately contended the officers followed proper policies."
They also allege that the opening statement impermissibly urged the jurors to infer
that the plaintiffs had engaged in criminal activity. But "look[ing] to the entire
argument, the context of the remarks, [and] the objection raised," we cannot
conclude that these remarks "impair[ed] gravely the calm and dispassionate
consideration of the case by the jury." Allstate, 845 F.2d at 318 (quotations
omitted). Each of the allegedly prejudicial statements has been addressed in other
arguments raised and rejected on appeal. As we have discussed, evidence of the
plaintiffs' criminal histories was admissible: Cure's because her credibility as a
witness was at issue, and Blackwood's because it showed his motive to flee.
Evidence of Cure's drug use was likewise admissible to challenge her ability to
perceive the events of that night and accurately recount them to the jury. The
alleged "inferences" that the plaintiffs engaged in criminal activity were merely
statements of undisputed record facts -- namely, that the officers were members of
the Robbery Intervention Detail and that they were policing a high-crime area. All
of the challenged statements were based on record facts and were admissible on
their own merit. Moreover, the trial court correctly instructed the jury that
"anything the lawyers say is not evidence in the case." The plaintiffs have not
shown that the statements were "plainly unwarranted and clearly injurious,"

39

Goldsmith, 513 F.3d at 1282 (quotation omitted), and there was no abuse of discretion in allowing them.

## III.

Knight and Cure also claim that the court erred in granting summary judgment to certain defendants. Specifically, they challenge the orders granting summary judgment to the County and the supervising officers based on their "failure . . . to train and implement clear policies to protect individuals from excessive police force," and to Detectives Goldston and Raphael premised on allegedly unconstitutional interrogation tactics. We remain unpersuaded.

We review a district court's order granting summary judgment based on qualified immunity de novo. Carr, 338 F.3d at 1266. "Summary judgment is proper if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Fed. R. Civ. P. 56(a)). "We review all evidence and factual inferences in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-movant." Morton v. Kirkwood, 707 F.3d 1276, 1280 (11th Cir. 2013) (quotations omitted).

A.

As for the § 1983 claims levelled against the County and the supervising officials, the plaintiffs claim that disputed issues of material fact remained as to whether these defendants failed to develop a constitutionally adequate excessive-force policy and failed to properly train police officers on the use of force.[4]  The district court did not err in granting summary judgment on either claim.

As for the plaintiffs' policy-based claim, it is by now well established that municipalities "can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 690 (1978).  This liability is premised on a constitutional violation carried out by the County itself and cannot be based on theories of respondeat superior or vicarious liability.  See City of Canton, Ohio v. Harris, 489 U.S. 378, 385 (1989).

To establish a county's policy, a plaintiff must "identify either (1) an officially promulgated county policy or (2) an unofficial custom or practice of the

---

[4] Although the plaintiffs style their argument as a challenge to "all counts" on which summary judgment was granted, their briefs do not mention the wrongful-death claim against the County. Thus, any argument concerning the wrongful-death claim against the County has been waived and is not at issue on appeal. See Access Now, 385 F.3d at 1330.

county shown through the repeated acts of a final policymaker for the county."

Grech v. Clayton Cty., Ga., 335 F.3d 1326, 1329 (11th Cir. 2003) (en banc).  As

we have recognized, "a county rarely will have an officially-adopted policy of

permitting a particular constitutional violation."  Id. at 1330.  Thus, most plaintiffs

"must show that the county has a custom or practice of permitting [the violation]

and that the county's custom or practice is the moving force behind the

constitutional violation."  Id. (quotations and alteration omitted).  Under either

theory, a plaintiff must show that the county "has authority and responsibility over

the governmental function in issue" and must also "identify those officials who

speak with final policymaking authority for that local governmental entity

concerning the act alleged to have caused the particular constitutional violation in

issue."  Id.

In this case, the plaintiffs do not claim that the County has an official policy

allowing officers to shoot the unarmed occupants of a vehicle without provocation

or an objectively reasonable basis to do so.  They argue instead that the County's

use-of-force policy is constitutionally deficient.  But the plaintiffs never introduced

this policy into the record and never explained how the policy itself was

constitutionally deficient.  Thus, a claim based on an official policy fails, and the

plaintiffs must instead establish "an unofficial custom or practice of the county

shown through the repeated acts of a final policymaker for the county."  Id. at

42

1329.  However, the plaintiffs have provided no evidence of repeated acts by the County besides the events at issue in this case.  They merely asserted that "[t]he ambiguity of the controlling policies renders county liability ripe for jury determination" and that the evidence was "sufficient to show a wide scale practice posing a persuasive and unreasonable risk of constitutional injury to citizens."  Without more, so broad and general a claim cannot give rise to liability.

The trial court also correctly rejected the plaintiffs' failure-to-train claims.  Both municipalities and supervising officers may be held liable under § 1983 for a failure to train subordinate officers.  A municipality may be held liable for the failure to train its employees when "the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  Harris, 489 U.S. at 388.  To establish "'deliberate indifference,' a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action."  Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998).  "[S]howing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability."  Connick v. Thompson, 563 U.S. 51, 68 (2011).  As we have said, "without notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train and supervise."  Gold, 151 F.3d at 1351.

43

Supervising officers can be held independently liable under § 1983 for a failure to train their subordinates "either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation." Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990). The necessary causal connection "can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so." Id. But one incident will not suffice; rather, "[t]he deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant, and of continued duration, rather than isolated occurrences." Id. As we have recognized, "[t]he standard by which a supervisor is held liable in her individual capacity for the actions of a subordinate is extremely rigorous." Braddy v. Fla. Dep't of Labor & Emp't Sec., 133 F.3d 797, 802 (11th Cir. 1998).

In this case, the plaintiffs argued that "[i]t is for the jury in such cases . . . to determine whether the failure to train and supervise were the causes of the ensuing use of deadly force." But they offered no evidence that the County or supervising officers had notice of a need to improve the officers' training or supervision, they never provided any indication that this is a widespread problem of which the County or supervising officers should have been aware, and they never highlighted

44

specific deficiencies in the County's training program. Instead, the only "evidence" suggesting a pattern of tortious conduct is this case itself. The district court thus correctly concluded that "there [was] absolutely no evidence in the record to support such a finding" of deliberate indifference. On this basis, it was proper to grant summary judgment to the County.

The plaintiffs' § 1983 policy-based and supervisory liability claims also fail for a second reason: the jury determined that the officers did not use excessive force and therefore committed no constitutional violations. There can be no policy-based liability or supervisory liability when there is no underlying constitutional violation. See City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point.") (emphasis omitted). Because the jury in this case decided that the plaintiffs suffered no constitutional injury, the County and the Police Department cannot be held liable for failure to promulgate or train on a force policy. See Miller v. Harget, 458 F.3d 1251, 1261 (11th Cir. 2006). There was no error in the district court's grant of summary judgment to the County and the supervising officers.

45

B.

The district court also granted summary judgment to Detectives Goldston

and Raphael on Count 11 -- Cure's § 1983 claim for violations of her Fourth, Fifth,

Eighth, and Fourteenth Amendment rights -- finding that, on the undisputed facts,

no constitutional violations occurred.[5]  These claims arose from Cure's allegations

that the Detectives detained her "against her will and [used] threats, promises,

coercion, and intimidation in order to extract a false statement from her to justify

the police shooting."

As this Court has often observed, "qualified immunity offers complete

protection for government officials sued in their individual capacities as long as

their conduct violates no clearly established statutory or constitutional rights of

which a reasonable person would have known."  McCullough v. Antolini, 559 F.3d

1201, 1205 (11th Cir. 2009) (quotations and alteration omitted).  "The purpose of

qualified immunity is to allow officials to carry out discretionary duties without the

chilling fear of personal liability or harrassive litigation, 'protecting from suit all

but the plainly incompetent or one who is knowingly violating the federal law.'"

Id. (quoting Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002)) (citation

omitted); see also Pearson v. Callahan, 555 U.S. 223, 231 (2009) ("Qualified

---

[5] Cure's pleadings did not allege any facts supporting or relating to her Eighth Amendment arguments; that argument is also absent in the briefing.  This claim has therefore been waived and is not at issue on appeal.  See Access Now, 385 F.3d at 1330.

immunity balances two important interests -- the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.").

"[T]o receive qualified immunity, an official must first establish that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." McCullough, 559 F.3d at 1205 (quotations omitted).  If the official can make that showing, "the burden then shifts to the plaintiff to show that the grant of qualified immunity is inappropriate."  Id.  Under the Supreme Court's instruction in Pearson, this Court will grant qualified immunity to the officials unless the plaintiff satisfies two requirements: "first, that the facts viewed in the light most favorable to the plaintiff establish a constitutional violation by the officers, and, second, that it was clearly established at the time of the incident that the actions of the defendant were unconstitutional."  Id.  We are "permitted to exercise our sound discretion in deciding which prong of this inquiry to address first."  Id. (quotations and alteration omitted).

Cure's claims raise both Fourth and Fifth Amendment issues.  The Fourth Amendment issues arise from her allegations that she was unlawfully seized by Detectives Goldston and Raphael "without lawful authority and absent [her] voluntary consent."  The Fifth Amendment issues center around the allegedly

47

coercive interrogation tactics that the detectives employed during their questioning. After careful review, we hold that the district court did not err in concluding that the detectives were entitled to qualified immunity on both claims.

1.

Under the Fourth Amendment, "a person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained" so that, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." United States v. Mendenhall, 446 U.S. 544, 553–54 (1980); see also United States v. House, 684 F.3d 1173, 1199 (11th Cir. 2012). But "[a]s long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification." Mendenhall, 446 U.S. at 554; see also United States v. McDowell, 250 F.3d 1354, 1362 (11th Cir. 2001) (explaining that whether a person is in custody "depends on whether under the totality of the circumstances, a reasonable man in his position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave") (quotations and alterations omitted). As we have said, "[t]he test is objective: the actual, subjective beliefs of the [interviewee] and the interviewing officer on

48

whether the [interviewee] was free to leave are irrelevant." United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996).

To determine whether an individual was in custody, we have considered factors such as whether the individual was "physically moved or restrained by officers on the way to the scene of the interview"; whether "handcuffs were employed" or "guns were drawn"; and whether the individual was "booked or told of formal accusations" or "told that [s]he was under arrest." Id. In addition, a "conclusion that no seizure occurred is not affected by the fact that the respondent was not expressly told by the agents that she was free to decline to cooperate with their inquiry, for the voluntariness of her responses does not depend upon her having been so informed." Mendenhall, 446 U.S. at 555.

Based on these factors, the district court was correct to determine that no genuine issue of material fact existed regarding whether Detectives Goldston and Raphael were entitled to qualified immunity. Cure was never handcuffed or physically restrained, she was never booked, she was never told that she could not leave, she was never told that she was under arrest, and she was never told that any charges against her were being considered. Moreover, she voluntarily agreed to accompany Detective Goldston to the police department that night. There was no error in granting summary judgment to Detectives Goldston and Raphael on Cure's § 1983 claims stemming from alleged Fourth Amendment violations.

49

2.

Cure also alleges that her Fifth Amendment rights were violated because Detectives Goldston and Raphael "subjected her to coerced interrogation, extracted a false and erroneous statement from her procured by promises and benefits, and refused to allow her to leave until she gave a statement purporting to justify the police shooting." These claims implicate two clauses of the Fifth Amendment: the Self-Incrimination Clause and the Due Process Clause. The Fifth Amendment's Self-Incrimination Clause "requires that '[n]o person . . . shall be compelled in any criminal case to be a witness against himself.'" Chavez v. Martinez, 538 U.S. 760, 766 (2003) (quoting U.S. Const. amend. V) (emphasis in original). This clause is violated only when compelled testimony is used against the witness in a criminal case. See id. ("We fail to see how, based on the test of the Fifth Amendment, Martinez can allege a violation to this right, since Martinez was never prosecuted for a crime, let alone compelled to be a witness against himself in a criminal case."). On the plain text of the Fifth Amendment, then, we need not proceed any further with Cure's claims of self-incrimination. As the trial court correctly noted, Cure was never arrested or subjected to prosecution and her statements were not being used against her in a criminal proceeding. Thus, summary judgment was properly granted to the detectives on her Fifth Amendment self-incrimination claims.

50

As for Cure's due process claim, the district court's grant of summary judgment again must be affirmed.  Separate and apart from self-incrimination concerns, we have noted that "coercive interrogation alone may violate a suspect's right to substantive due process, even when no self-incriminating statement is used against the person interrogated."  Tinker v. Beasley, 429 F.3d 1324, 1327 (11th Cir. 2005).  To give rise to a constitutional violation, such techniques must "shock[ ] the conscience."  Cty. of Sacramento v. Lewis, 523 U.S. 833, 846 (1998).  This is a high standard -- "[o]nly the most egregious official conduct will be the sort of abusive executive action that can be sufficiently arbitrary for constitutional recognition as a potentially viable substantive due process claim."  Carr, 338 F.3d at 1271 (quotations omitted).

On this record, there is no evidence of coercion at all, let alone coercion that "shocks the conscience."  Cure was never threatened and force was never used against her.  Nevertheless, Cure argues that, given her mental state, the way in which the questioning was carried out shocked the conscience.  She alleges that she was "subjected to an exhaustingly long interrogation"; that "she was left alone to deal with diarrhea, nausea, and bleeding from her wound"; and that she was anguished because "Goldston belonged to the very same department that shot [her] and killed her friends."  While these circumstances no doubt resulted in a very difficult night, they do not rise to the level of extreme conduct that is "so offensive

51

to a civilized system of justice that [it] must be condemned under the Due Process Clause." Miller v. Fenton, 474 U.S. 104, 109 (1985). Again, we conclude that there was no error in the district court's ruling.

IV.

This is, undoubtedly, a very sad case. But after carefully reviewing this record, we cannot conclude that there was any reversible error during the trial. Nor can we find any error in the district court's grants of summary judgment to the County, the supervising officers, or Detectives Goldston and Raphael. Thus, the trial court's judgment is AFFIRMED.

AFFIRMED.